MARKS BERWIN, administrator, *vs.* ROBERT P. CABLE.

Suffolk.   February 2, 1943. — March 30, 1943.

Present: FIELD, C.J., LUMMUS, DOLAN, COX, & RONAN, JJ.

*Joint Enterprise. Practice, Civil,* Action for share of profits.

One of three joint adventurers, who were not partners, in a complicated
   undertaking involving relations with other parties, was not entitled
   to maintain an action of contract against the other two adventurers
   for a share in the profits of the venture where the evidence showed the
   necessity of a complete accounting to establish the amount of the net
   profits, if any, and that no such accounting had been had.

CONTRACT.   Writ in the Superior Court dated February
3, 1938, originally against Robert P. Cable and Nathan
Thomson, and, after the death of Thomson before trial and
discontinuance as against him, prosecuted against Cable
alone.

The case was tried before *Buttrick,* J., who denied a motion
by the defendant for a directed verdict on the first count of
the declaration, and ordered verdicts for the defendant on
the other counts.   There was a verdict for the plaintiff on
the first count.   The defendant alleged exceptions.

*H. Bergson,* (*P. Bergson* with him,) for the defendant.

*L. Brown,* (*W. J. Barry* with him,) for the plaintiff.

RONAN, J.   This is an action at law to recover one third
of the profits of a joint undertaking.   It is alleged in the
first count of the declaration, which is the only count with
which we are now concerned, that the plaintiff's intestate,
one Berwin, entered into an agreement with the defendants,
Cable and Thomson, in accordance with which Berwin was
to devote his time and efforts to secure from the United

States government the sale to the defendants and himself of certain excess and surplus war material consisting of approximately two million pieces of underwear; that the underwear was to be purchased if the defendants deemed it desirable to do so; that if the purchase was made, the defendants were to furnish the necessary financial and marketing arrangements for the resale of these goods; that Berwin and the defendants formed the Newbury Manufacturing Co. Inc., a corporation, hereinafter called Newbury; that the United States government made a contract for the sale of these goods to Newbury; that some of them were resold by Newbury; that the remainder of the goods was sold by Newbury to Belmont Knitwear Co., hereinafter called Belmont; and that Belmont sold and disposed of all of these goods. It is finally alleged that a profit of $300,000 was realized from the sales, and that the defendants owe the plaintiff $100,000 as his intestate's share of the profits. The defendant Thomson died before the trial and the action was prosecuted against Cable. The jury returned a verdict for the plaintiff in the sum of $46,666.66.

The exceptions of the defendant require reference to portions of some of the material testimony, which we now proceed to make. Newbury was incorporated in the fall of 1932. Cable held ninety-eight shares and was treasurer, Thomson held one share and was assistant treasurer, and Berwin held one share and was president. Cable advanced $10,000, which was submitted with Berwin's bid for the purchase of the underwear from the United States government. The United States government made a contract on October 29, 1932, with Newbury for the sale of this lot of two million, two hundred thousand pieces of underwear. The contract price exceeded $300,000 and the contract prohibited the resale of the goods in this country. The merchandise was to be taken out of government warehouses and paid for within nine months. Newbury received a part of these goods and endeavored to sell them but sales were slow, probably due to the restricted area in which the goods could be sold. The restriction was removed on July 11, 1933, through the efforts of counsel, who was paid $25,000. Sales were then

made in this country.  There was testimony that Cable advanced this last mentioned sum, and that in all he invested $85,000 in the venture.  In the summer of 1933, Newbury made an agreement with Shapiro Bros. Factors Corp., hereinafter called Shapiro, to finance the purchase of the goods.  Shapiro, in order to enable Newbury to obtain the goods and to pay for them, furnished letters of credit to the amount of $305,000, shipped the goods to a New York warehouse, passed upon all sales, collected the purchase price, and had a general lien on the goods as security with the power to sell for any breaches of the agreement by Newbury.  Shapiro was to be paid interest, a commission, and necessary charges and expenses.  Both Cable and Thomson personally guaranteed the performance of this agreement by Newbury.  Newbury borrowed $50,000 from one Wollman, which was paid to Shapiro; and Newbury promised to pay Wollman interest, assigned to him a certain part of the proceeds from the amounts payable by Shapiro until the loan was paid, and thereafter Wollman was to receive a one-fourth interest in all money payable to Newbury by Shapiro or, at his election, Wollman could take one fourth of all merchandise then remaining unsold.  Both defendants guaranteed the performance by Newbury of this agreement with Wollman.  Cable became dissatisfied with the progress of the sales and was anxious to close the venture but Thomson was unwilling to dispose of the goods by an immediate sale.  Thomson agreed to pay $20,000 to Cable in addition to the money he had advanced, and to purchase the rest of the lot, which then consisted of one million five hundred thousand pieces of underwear, and to pay $300,000.  Thomson formed the Belmont Knitwear Co. and in the summer of 1934 took title to these goods in the name of this corporation.  The purchase was financed with the same two firms that financed the original sale to Newbury by similar agreements, but without personal guarantors.  By April, 1935, Cable had received from Newbury through Shapiro $105,000.  Cable at the trial produced a record purporting to show the advances he had made to Newbury, but he was unable to show by this record that he advanced $85,000 and the

account showed that the cash receipts amounted to $8,500. The books of account of Newbury were not introduced in evidence. Neither were any records from Shapiro or Wollman. A schedule of withdrawals from Newbury by Thomson from November 1, 1933, to December 31, 1934, which were paid by Shapiro, was introduced in evidence. For the first year of this period they showed that Thomson withdrew $39,552.25, of which he retained $7,800 as a salary and $3,900 as expenses. This schedule shows the payment of $50 a week to Berwin. It is difficult to understand how withdrawals should be charged to Newbury after it had closed its business by the sale to Belmont in the summer of 1934. The plaintiff relied upon statements made by Berwin to the effect that the goods cost fourteen and one half cents a piece; that it cost somewhere between four and five cents a garment to sell them; that he had seen the books of Newbury; that the goods had sold for thirty-three cents a piece; and that the profit was the difference between thirty-three cents and twenty cents and he had $100,000 profit. There also was evidence sufficient to support a finding that the parties had agreed to share the profits equally.

The first and principal contention of the defendant is that this action at law which is based upon an express contract to recover a share of the profits cannot be maintained. Preliminary to a discussion of that question a word must be said as to the relation of the parties to each other. Berwin's duty was to secure the goods from the Federal government on the most advantageous terms. He was not required to exercise any supervision or management over the venture. He assumed no personal obligation for any losses that might be sustained. It is true that he was the president of Newbury, but that corporation was little more than the medium through which the undertaking was to be launched and conducted. Cable was to furnish the funds necessary to start and maintain the enterprise until permanent financial arrangement could be made which would enable Newbury to take and pay for the goods and sell them to its customers. Thomson was from the beginning the active and dominating figure in conducting the affairs of the enterprise. The

parties were not partners. *Sikes* v. *Work,* 6 Gray, 433. *McMurtrie* v. *Guiler,* 183 Mass. 451. *Mitchell* v. *Gruener,* 251 Mass. 113. But a joint venture, like the one in the instant case, is similar in many respects to a partnership, and we know no reason why the principles of law governing the remedy by which a partner might recover his share of the profits are not applicable to a joint adventurer seeking to obtain his share of the profits of a joint undertaking. *Wendell* v. *Clark,* 240 Mass. 562. *Rosenblum* v. *Springfield Produce Brokerage Co.* 243 Mass. 111. *Beatty* v. *Ammidon,* 260 Mass. 566. *Edgerly* v. *Equitable Life Assurance Society,* 287 Mass. 238.

A partner has the right in this Commonwealth to maintain an action of contract against his copartner to recover his share of the profits in a somewhat limited but clearly defined class of cases. *Brigham* v. *Eveleth,* 9 Mass. 538. *Jones* v. *Harraden,* 9 Mass. 540. *Bond* v. *Hays,* 12 Mass. 34. *Wilby* v. *Phinney,* 15 Mass. 116. *Shepard* v. *Richards,* 2 Gray, 424. *Wheeler* v. *Wheeler,* 111 Mass. 247.

An action of account with its disadvantages, some of which are mentioned in the cases just cited, never came into general use in this Commonwealth. The usual remedy was an action of assumpsit, and this form of action superseded the action of account, which fell into disuse and had become obsolete long before it was abolished by Rev. Sts. c. 118, § 43. *Fanning* v. *Chadwick,* 3 Pick. 420, 424. *Fowle* v. *Kirkland,* 18 Pick. 299. *Bartlett* v. *Parks,* 1 Cush. 82. *Holmes* v. *Hunt,* 122 Mass. 505, 512, 513. Assumpsit became the accepted and in fact the only remedy open to a partner to obtain his share of the profits. But even assumpsit could not be maintained unless the plaintiff proved that the nature of the accounts was such that a final balance could be struck; otherwise he had no remedy whatever until jurisdiction in equity to determine "all disputes between copartners . . . in cases where there is no adequate remedy at law" was conferred on this court by St. 1823, c. 140, § 2. It was said in *Chandler* v. *Chandler,* 4 Pick. 78, 82, that "It is a known principle of the common law, that an action will not lie by one partner against another, except where there

has been an adjustment of accounts and a balance struck, so that until the statute of 1823 there was no remedy in this commonwealth in the cases which must frequently occur of partnerships dissolved by death or otherwise without any settlement of the accounts." The purpose of the statute was to furnish a remedy in addition to but not in substitution for the existing remedy in assumpsit, and where the latter remedy was available then one had no right to bring a suit in equity. *Fanning* v. *Chadwick*, 3 Pick. 420, 424. *Blood* v. *Blood*, 110 Mass. 545, 547. A partner, therefore, after St. 1823, c. 140, had the right to maintain an action of assumpsit if he brought his case within the established principles permitting such action, otherwise he could proceed in equity. The statute, Rev. Sts. c. 118, § 43, abolishing actions of account and providing that "when the nature of an account is such, that it cannot be conveniently and properly adjusted and settled in an action of assumpsit, it may be done upon a bill in equity," has since continued in force and in its present form appears as G. L. (Ter. Ed.) c. 214, § 3 (6), while St. 1823, c. 140, § 2, continued in effect until it was eliminated in the compilation of the Revised Laws, since it was deemed no longer necessary in view of the fact that full jurisdiction in equity was conferred upon this court by St. 1877, c. 178. *Emerson* v. *Atkinson*, 159 Mass. 356. See Report of the Commissioners for Consolidating & Arranging the Public Statutes, 1901, page 1364.

An action of contract in the nature of assumpsit (see G. L. [Ter. Ed.] c. 231, § 1) will not lie unless the business of the partnership has ceased, its creditors have been paid and its assets collected, or the accounts are such that a final balance can be readily determined so that, as a practical matter, all that remains to be done is to divide the net profits, and the judgment to be rendered will effect a final settlement between the partners of all matters connected with the partnership. *Rockwell* v. *Wilder*, 4 Met. 556. *Fanning* v. *Chadwick*, 3 Pick. 420. *Brinley* v. *Kupfer*, 6 Pick. 179. *Williams* v. *Henshaw*, 11 Pick. 79. *Dickinson* v. *Williams*, 11 Cush. 258. *Sikes* v. *Work*, 6 Gray, 433.

*Shattuck* v. *Lawson*, 10 Gray, 405. *Starbuck* v. *Shaw*, 10 Gray, 492. *Fargo* v. *Saunders*, 4 Allen, 378. *Wheeler* v. *Wheeler*, 111 Mass. 247. *Currier* v. *Hallowell*, 158 Mass. 254. *McLauthlin* v. *Smith*, 166 Mass. 131. The financial affairs of a partnership are not likely to be in such shape that a balance may be struck before an accounting, which may be more or less complicated, depending upon the nature and size of the business and the manner and methods pursued in its conduct, and in order to have the account stated and the interests of the partners settled and adjusted resort must be had to a suit in equity. Besides, jurisdiction in equity is exclusive except where the situation is such that an action in assumpsit might have been brought in accordance with the principles already stated. *Chandler* v. *Chandler*, 4 Pick. 78. *Miller* v. *Lord*, 11 Pick. 11. *Williams* v. *Henshaw*, 12 Pick. 378. *White* v. *Harlow*, 5 Gray, 463. *Gomersall* v. *Gomersall*, 14 Allen, 60. *Duff* v. *Maguire*, 99 Mass. 300. *Ryder* v. *Wilcox*, 103 Mass. 24. *Remington* v. *Allen*, 109 Mass. 47. *Couilliard* v. *Eaton*, 139 Mass. 105. *Cutting* v. *Daigneau*, 151 Mass. 297. *Smith* v. *Butler*, 164 Mass. 37.

We now proceed to determine whether the plaintiff has made out a case on the law side of the court. The evidence was sufficient to show that Newbury had ceased to conduct business, and our inquiry is narrowed down to the question whether there was evidence that would warrant a jury in finding that its financial affairs were in such a condition that the amount of the profits and share of the intestate therein could be readily ascertained. No books of account were introduced in evidence and the record does not disclose any attempt on the part of the plaintiff to have the books produced at the trial. There was some evidence tending to show that the books were in New York and some indicating that they were in possession of the Federal government, but there was nothing to show that they would not have been produced upon notice or that summaries of the books could not have been secured by deposition. *Amherst Bank* v. *Conkey*, 4 Met. 459. *Binney* v. *Russell*, 109 Mass. 55. *L'Herbette* v. *Pittsfield National Bank*, 162 Mass.

137.　The only evidence relative to anything contained in the books of Newbury is an alleged declaration of the intestate that he saw the books and that they showed that the goods were sold for thirty-three cents a piece. While we do not intimate this evidence was competent, *Hunt* v. *Roylance*, 11 Cush. 117; *Peaks* v. *Cobb*, 192 Mass. 196; *Davis* v. *Royal Arcanum*, 195 Mass. 402, it is enough to point out that it did not show that the state of the accounts of Newbury was such that an action of contract would lie. There was nothing to show what profit Newbury obtained from the sales of seven hundred thousand pieces of underwear, or from the sale of two thirds of the lot to Belmont for $300,000, when the purchase price of the entire lot was about $319,000. Funds in considerable amounts which appear to be in the nature of current expenses were paid out by Newbury long after the sale to Belmont. The record does not disclose that either defendant was released by Shapiro and Wollman on his personal guaranty that Newbury would pay sums aggregating more than $300,000. Cable was paid $105,000 by Shapiro in behalf of Newbury, and if any part of it represented a sum in excess of what Cable had invested, that sum was not determined upon any accounting between the defendants, and its receipt by Cable falls far short of furnishing any guide by which the actual profits of Newbury could be determined with any fair degree of certainty. The evidence tended to show that what Cable received was the purchase price from a sale of his interests to Thomson rather than a division of the profits which had been ascertained by an accounting. In the next place, the defendant offered the records of actions then pending against Newbury, Belmont, Cable and Thomson by the United States to recover damages, in substantial amounts, for breach of the contract for the sale of the underwear to Newbury. Until the liability of Newbury, Cable and Thomson was settled either against them or in their favor, the net profits of the venture could not be determined. The final outcome of this litigation subsequent to the trial did not affect the offer of proof, and the fact that the Federal government was then claim-

ing a large sum due for damages was competent on the question of the amount of profits and also on the issue whether the accounts of Newbury were settled so that an action at law would lie for a recovery of a share of the profits. *Fuller* v. *Miller*, 105 Mass. 103. *Thurston* v. *Hamblin*, 199 Mass. 151, 158–159. *Stone* v. *Wright Wire Co.* 199 Mass. 306, 308. *Daly* v. *Chapman Manuf. Co.* 246 Mass. 118. *Stewart* v. *John R. Lankenau Co.* 259 Mass. 242.

Without further discussing the evidence, it is enough to say that the testimony was insufficient to show that Newbury had paid all its indebtedness, collected all its assets, and that nothing remained but the distribution of its profits. Its financial condition was not shown to be such as would permit the striking of a balance in favor of the plaintiff. Upon this evidence, we do not see how the amount of profits can be ascertained until after a full accounting is had of all the various transactions in which Newbury was a party, including not only all its receipts and expenditures, but also its financial dealings with both Shapiro and Wollman in carrying out a highly complicated financial arrangement with them. If Cable has taken more than his share of the profits, then the amount, if any, that the plaintiff is entitled to recover from him must await the statement of the account upon the entire transaction. *Chopelas* v. *Chopelas*, 303 Mass. 33. *Milbank* v. *J. C. Littlefield, Inc.* 310 Mass. 55. It follows that the evidence was insufficient to maintain an action at law to recover a share of the profits. The defendant insisted upon this point from the beginning of the trial, *Hoshor-Platt Co.* v. *Miller*, 190 Mass. 285, and the objection, that an action at law will not lie by one partner against another, "is not merely technical; it grows out of their legal relations." *White* v. *Harlow*, 5 Gray, 463, 468. There was error in refusing to grant the motion requesting a directed verdict upon the evidence and pleadings but, we think, judgment ought not to be ordered for the defendant without affording the plaintiff an opportunity to amend by changing the action at law into a suit in equity. If such an amendment

is allowed within sixty days from the date of the rescript, the case is to stand for a hearing upon the merits, otherwise judgment is to be entered for the defendant.

*So ordered.*