Charles **WRIGHT** (Plaintiff), Respondent,

v.

Jerome **FICK**, Administrator of the Estate of **Lydia Druin**, deceased (Defendant), Appellant.

No. 29085.

St. Louis Court of Appeals.

Missouri.

Feb. 15, 1955.

608

Mosby & Mosby, Linn, for appellant.

Henry Balken Bush, Linn, for respondent.

HOUSER, Commissioner.

This is a suit at law by Charles Wright against Jerome Fick, administrator of the estate of Lydia Druin, deceased, for one-half the proceeds of the administrator's sale of personal property inventoried as that of the deceased. From a judgment for $1,216 entered upon a jury verdict the administrator has appealed to this court, contending that the petition did not state a cause of action and that there was a failure of proof.

The petition alleged that on November 1, 1940, Lydia Druin and Charles Wright entered into an oral agreement "in the nature of a joint adventure" with respect to farm lands of Lydia's late husband Victor, whereby Charles would move into the home and the two of them "would operate the farm to the best of their joint abilities and do the things necessary to that end and the income and profits derived from the operation of the Homestead would be used for their living expenses jointly and after all living expenses and the expenses of the operation of the Homestead farm were paid any saving and accumulations of money, live stock, farm products and goods and chattels would be and were their joint property." Then followed allegations of full performance by both parties; operation of the farm as a joint adventure through the years; Lydia's death on March 14, 1953; and the accumulation of savings and profits of $2,384.42 in cash, cattle worth $1,-176, chickens worth $35.82, hay of the value of $34.80, a $7.50 woodsaw and a $10 automobile as a result of their joint efforts. Plaintiff further alleged that the goods and chattels had been converted into cash; that all of the cash, totaling $3,648.54, was in the hands of the administrator; demand and refusal. Plaintiff prayed for one-half of the latter sum, namely, $1,824.-27, plus interest.

Defendant's answer consisted of a general denial and a plea of the statute of frauds. Defendant filed a motion to dismiss, alleging failure to state a claim upon which relief can be granted, which motion was overruled.

A resume of plaintiff's evidence follows. Victor and Lydia Druin, husband and wife, were residents of Osage County. They lived on a farm which belonged to Victor. Shortly before his death in November, 1940 Victor, desiring to make some arrangements for the care of Lydia, sent for Charles Wright, and a conversation was had in which "they" (presumably Victor and Lydia) said they wanted to make an agreement;

that Victor had called Charles "to fix that, so somebody would be there with Lydia after he was gone." Victor and Lydia said that if Charles "would stay with Aunt Lydia, he would have half." Victor said that the best way he knew to do it was to divide and arrange so that Charles would "get about half." That was about all that was said. Lydia owned the cattle on the farm after the death of Victor. Plaintiff moved onto the farm and he and Lydia lived there until her death some 12 or 13 years later. Plaintiff took care of the stock, put up hay, got in wood, fixed fences, gardened, etc. At a time not shown, but apparently not long before Victor's death, plaintiff's sister Anna Roark, at the direction of Lydia, drew Lydia's money out of the bank (all the money she had, amount not stated) and sent it to a son in South Dakota, Ivan Druin, who was about to lose his property. It was not shown whether this was a loan or a gift or whether Ivan ever returned it to Lydia. A traveling salesman for Rawleigh's Products, in the winter of 1940–41 sold Lydia a bill of goods and she and plaintiff settled the bill by each paying half. Oscar Rodgers, for whom plaintiff worked from time to time, testified that on pay days plaintiff would often cash his check and give Lydia half of the amount of the check. Plaintiff would purchase and haul sacks of feed to the farm and buy groceries out of these pay checks. Lydia and plaintiff paid a $10 or $20 balance due on a mortgage on the land. On one occasion Lydia told her nephew Norman Wright that she and plaintiff were "saving their money together." Lydia told another nephew Alonzo Wright that she and plaintiff went "halvers" on the stock and that they were "halvers" on the truck gardening patch. On the day Lydia was taken to the hospital she told plaintiff to get the money and bring it to her. She told him where it was kept, in a closet and in a wardrobe in old-fashioned pocket books and a box. He got the money, which was counted, and she delivered it to one August Malan for safekeeping. It amounted to $2,432. The money was put in the bank and later turned over to the administrator.

Plaintiff's evidence further revealed that in 1940 or 1941 Lydia told the Rawleigh salesman that she didn't know what she would do if it wasn't for Charlie; that if Charlie stayed with her until her death she "wanted to try to make it all right, and give Charlie half interest in the property, if there was any money left there. * * * She said she intended to make it right with Charlie if he stayed with her until her death. She intended for the stuff to go fifty-fifty—half of the property."

Lydia lost her old age pension. In the fall of 1952, in order to qualify for a renewal of the pension, she disposed of her chickens and cattle and told Anna Roark that all she had was one cow; that the rest of the stock—"what was left"—was Charlie's, including the chickens.

Following Lydia's death in March, 1953 it was agreed between plaintiff's attorney and the administrator that all of the specific personal property to which plaintiff made claim to a half interest, namely, the cattle, hay, chickens, woodsaw and automobile, would be sold and that plaintiff later would make a claim for half of the proceeds. Pursuant to the agreement the administrator of Lydia's estate conducted a sale of this property, and realized the amounts as alleged in the petition.

For his first point appellant-administrator contends that the court erred in overruling his motion to dismiss plaintiff's petition for failure to state a claim upon which relief may be granted. He proceeds upon the theory that the rights of joint adventurers are governed by the rules applicable to partnerships, and that as a consequence one joint adventurer cannot sue another at law when the controversy involves an investigation and settlement of the joint account until there has been an accounting of the affairs of the joint adventure and a balance struck.

A suit at law properly may be maintained by one joint adventurer against another for his share of the profits without the necessity of an accounting, where the amount sued for can be ascertained easily

and definitely. Scott v. Kempland, Mo.Sup., 264 S.W.2d 349. On the other hand, such an action may not be maintained without an accounting and the striking of a balance where the profits have not been ascertained and they are not readily ascertainable by a simple computation, or where the amount due plaintiff cannot be known until a full accounting can be had. 48 C.J.S., Joint Adventures, § 12 b. (1), p. 849.

This case falls in the latter category. The ascertainment of the amount of profits in the operation of this farm over the long period of 12 or 13 years is not a matter of simple arithmetical computation, as in Scott v. Kempland, supra, where the amount sued for was readily ascertainable from written reports and where only one transaction (the sale of a single parcel of land) was involved. The profits, if any, due plaintiff in the instant case cannot be known except upon a full accounting. The profits consist of whatever is left over after all assets of the joint adventure have been collected, 48 C.J.S., Joint Adventures, § 11 d. (1), pp. 842–843, and all liabilities incurred in the operation of the farm, together with all living expenses incurred by the parties, have been settled and discharged. Involved are considerations of the original capital investment, Groseclose v. Hocking, Mo. Sup., 222 S.W.2d 754; the value of tangible property put into the enterprise; loans, advances or credits made by or to either of the parties; losses sustained; costs and expenses of operation, and living expenses. 48 C.J.S., Joint Adventures, § 11 d. (1), pp. 843, 844. Obviously, the amount due plaintiff, if any, could not be ascertained without the necessity of a complicated and extensive accounting.

■ The petition does not allege that there has been an accounting and settlement and striking of a balance. It merely alleges that the joint adventurers accumulated certain savings in the form of cash and specific personal property, which were the fruits and profits of the joint efforts of the parties and were the joint property of the parties at the death of Lydia. It is not alleged that all debts and liabilities to third parties, and costs and expenses of operation and living expenses have been paid, and that all of the assets of the joint adventure have been collected. No facts are alleged showing that all loans, advances, and credits due by or to the enterprise are accounted for. From the petition it cannot be ascertained whether the administrator has been allowed credit for the tangible property originally put into the enterprise by Lydia, namely, the cattle on the farm at the time of the death of Victor. There are no facts alleged from which it would appear that the amount due plaintiff can be ascertained easily and definitely, and that all that remains to be done is to divide the net profits. See Berwin v. Cable, 313 Mass. 431, 47 N.E.2d 951. Nor are these essential elements of a cause of action necessarily to be implied from the facts alleged. It is obvious that the petition wholly fails to state a claim upon which relief can be granted.

■ Nor were these omissions in the pleadings cured by proof of these facts at the trial. As a matter of fact plaintiff has not sustained the burden of proving the contract pleaded, or the source of the fund in appellant's hands, or that plaintiff is entitled to any part of it. The contract as alleged was an agreement to operate the farm jointly and devote the income and profits from the operation to the payment of the living expenses of the parties and that the saving and accumulation over and above expenses of operation and of living should be their joint property. While the evidence adduced sufficiently made out a case of agreement to operate the farm jointly there is no evidence upon which an agreement with respect to the payment of living or operational expenses can be made out, and the evidence with respect to the half and half division is too speculative and conjectural to provide a reasonable basis for a determination with respect thereto. There was evidence that plaintiff would "have" or "get" half and that the parties "went halvers" on the stock and garden.

It is impossible to determine from the evidence whether "half" means half of the product, or half of the gross profit, or half of the net profit after the payment of expenses of operation, or after payment of expenses of operation and living expenses. The evidence is too vague and uncertain to form the basis of a judgment.

Plaintiff failed to prove that the cash, cattle, hay, chickens, etc., were joint property accumulated as a result of the joint adventure. There is nothing to show that the $2,432 which Lydia brought to light on the day she went to the hospital was an accumulation of profits from the joint operation of the farm, or that plaintiff had any interest in the money. While there was evidence that the parties were "saving their money together," there is nothing in the evidence to show whether this money was the accumulated joint savings of the parties, or Lydia's own personal property. There was no evidence that plaintiff knew of the existence of this money prior to the time Lydia went to the hospital, or that he had access to it, or knew where it was kept, or that it was accumulated from the sale of farm products. Plaintiff did not show that he made claim to it when it was produced. There was no evidence that Lydia considered that the money was joint funds. The evidence revealed that she had an independent source of income, namely, a pension, but did not negative the possibility that the pension money paid to Lydia was a part or all of the $2,432. These facts do not authorize any inference that plaintiff had an interest in the money.

Plaintiff's evidence does not support the allegation that the automobile was the joint property of the parties. Plaintiff's witness testified that it belonged to Lydia.

With reference to the woodsaw, some of plaintiff's witnesses testified that it belonged to plaintiff whereas other witnesses for plaintiff testified that the woodsaw was jointly owned by Victor and three neighbors, each of whom had added various parts to it. Neither version supports the claim that the woodsaw was jointly owned by plaintiff and Lydia.

There was no evidence that the parties had paid all debts of the joint adventure, or that they had collected all of its assets, and that nothing remained but the distribution of profits. There was nothing to show that the financial condition of the joint adventure permitted the striking of a balance in favor of plaintiff.

Plaintiff neither produced books of account, nor explained their absence by showing that no books were kept.

On the whole record there is no substantial evidence upon which a jury could base a finding that the contract *as alleged* was made, that the funds in the hands of appellant constitute joint property or profits from the operation of a joint adventure, or that plaintiff is entitled to any part thereof as a joint adventurer. See Cross v. Gimlin, Mo.Sup., 256 S.W.2d 812.

For insufficiency of the petition and failure of proof the judgment must be reversed. There is sufficient evidence of a joint adventure and of performance on plaintiff's part, however, to indicate that an outright reversal might result in a miscarriage of justice. The record as a whole indicates that plaintiff has misconceived his remedy; that the facts have not been fully developed, and that evidence is available to plaintiff on a theory or theories not pleaded. As a consequence, the judgment should not be reversed without a remand, Schebaum v. Mersman, Mo.Sup., 191 S.W. 2d 671, in order to give plaintiff an opportunity to amend his petition in conformity with whatever evidence may be available to him in support of an equitable action for an accounting, or otherwise as he may be advised.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court, accordingly, is reversed and the cause re-

manded in order to give plaintiff an opportunity to amend his petition, if so advised, and for a new trial.

RUDDY, Acting Presiding Judge, and SAM C. BLAIR, Special Judge, concur.