**HOUGHTON MIFFLIN CO. v. STACK-POLE SONS, Inc., et al.**

No. 358.

Circuit Court of Appeals, Second Circuit.
June 9, 1939.

Archie O. Dawson, of New York City (John D. Mooney and Hines, Rearick, Dorr & Hammond, all of New York City, of counsel), for appellant.

Philip Wittenberg, of New York City, for appellees.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This is an appeal from the order of the District Court denying a preliminary injunction in an action to restrain infringement of the copyrights claimed by the plaintiff in Adolf Hitler's famous autobiographical and political treatise, "Mein Kampf." Two rival American editions of this work, in translation, are now being actively sold and distributed in this country. The one published by the defendants appears without claim of copyright authority, on the theory that the work is in the public domain and not protected by copyright. The one authorized by the plaintiff, and actually published by Reynal & Hitchcock, Inc., through arrangement with the plaintiff, appears under claim of copyright assignment from the German publishers of the book. The court denied the preliminary injunction sought by the plaintiff on the grounds that the defendants had raised questions of title and validity as to plaintiff's copyrights which were not free from doubt, and that the issues could not properly be determined on affidavits. The plaintiff appeals, asserting that on the admitted facts its legal right is sufficiently clear and its prospective loss is sufficiently great to entitle it to the injunction at this time.

■ In a case such as this, where two editions of a book of great popular interest are being actively promoted in competition with each other, it is obvious that much of the damage to a rightful owner of copyright, if any there be, will have been done by the time the action may be tried and final decree entered upon an accounting. Such owner needs protection now when the book is at the height of its sales, or else he may never be able to realize the fruits of ownership. Consequently it is settled in copyright cases that, if the plaintiff makes a prima facie showing of his right, a preliminary injunction should issue. American Code Co. v. Bensinger, 2 Cir., 282 F. 829, 835; L. C. Page & Co. v. Fox Film Corp., 2 Cir., 83 F.2d 196; Drone on Copyright, 516, 517. In our view, on such of the facts as are not in dispute, the plaintiff has so far established its right that it would be a denial of equity to allow the defendants under the circumstances to sell their book with impunity until the final outcome of the action.

The defendants do not dispute the fact that at the time of the hearing below they were about to publish and sell their edition of "Mein Kampf"; indeed, they admit this in their answer. They justify their conduct on two grounds: first, that the American copyrights issued in this case were invalid, because the author, Adolf Hitler, was "stateless" at the times they were issued, and second, that the plaintiff never acquired title to the copyrights. We shall discuss these claims in order.

First. A certificate of copyright registration of Volume 1 of "Mein Kampf" was issued by the United States Copyright Office in 1925 to Franz Eher Nachfolger G.m.b.H., of Munich, Germany, claimant of the copyright and publisher of the German edition of the book. In the application for the copyright, dated February 15, 1925, this publisher, in answer to the question on the application which read, "Country of which the author or translator is a citizen or subject," replied, "Staatenloser Deutscher." A certificate of copyright registration of Volume 2 of "Mein Kampf" was issued early in 1927 to the same concern. In its application dated December 24, 1926, the publisher answered this same question as to the author's country with the word "Osterreich." Defendants by extensive affidavits have produced evidence from German newspapers and other publications to the effect that on both occasions Adolf Hitler was a stateless person, a citizen or subject of no country, since, being born a citizen of Austria, he had served in the German army in the World War and had refused to respond to a call for service in the Austrian army. Plaintiff asserts its intent to offer proof at the trial that Hitler did not lose his Austrian citizenship, but, admitting for this motion that the author was stateless, nevertheless argues that the copyrights are valid, on the ground that a stateless person is entitled to the benefits of the American copyright laws.

This question must turn, therefore, upon our copyright statute. The statute particularly involved is Section 8 of Title 17, U.S.C.A., "Authors or proprietors, entitled; aliens."[1] Plaintiff relies on the broad grant of protection which it finds in the first sentence of this section, that "The author or proprietor of any work made the

[1] The following is the statute:
"Authors or proprietors, entitled; aliens. The author or proprietor of any

work made the subject of copyright by this title, or his executors, administrators, or assigns, shall have copyright for

subject of copyright by this title, or his executors, administrators, or assigns, shall have copyright for such work under the conditions and for the terms specified in this title." It is asserted that this grant contains no exception of any kind, and therefore accords the protection of the other provisions of the copyright law to stateless persons.

Defendants, however, assert that the only source of authority for the issuance of copyrights to aliens is found in the remainder of the statute, which continues: "The copyright secured by this title shall extend to the work of an author or proprietor who is a citizen or subject of a foreign State or nation only:" (a) when the alien author is domiciled within the United States at the time of the first publication of his work; or (b) when the foreign state affords reciprocity in the granting of copyright to American citizens. These claims of the parties are mutually exclusive. If the first sentence is a broad grant of authority, the plaintiff's position is sound; if the only grant of copyright protection to aliens is that of the second sentence, to those who are citizens or subjects of other nations, defendants have their justification for treating this work as in the public domain.

■ It is well settled that a "proprietor," not the author, stands in no better status in acquiring a copyright than does the author, and hence the Eher firm could not claim the benefits of the statute if Hitler was not in a position to do so. Bong v. Campbell Art Co., 214 U.S. 236, 29 S.Ct. 628, 53 L.Ed. 979, 16 Ann.Cas. 1126; cf. Copyright Office, Rules and Regulations, 2(2), 17 U.S.C.A. following section 53.

■ We think, however, that the statute does not deny protection to the literary property of a stateless person. No limitation upon the broad grant of the first sentence is expressed, and there is no reason why one should be read into it. It appears to be a general grant of protection to all authors, with the second sentence excepting a particular class for special treatment. And the history of the legislation tends to confirm this view.

Prior to 1891, copyright privileges in the United States were limited to an author who was "a citizen of the United States or resident therein." From the time when in 1837 Henry Clay made his report to the United States Senate (reprinted in G. H. Putnam, The Question of Copyright, 2d Ed. 32–39) urging copyright protection to citizens of Great Britain and France, there had been continuous and determined pressure, under the leadership of some of the greatest names in American literature, to secure protection of foreign writings in this country. This was put not merely on grounds of ethics and morality —as in the Rev. Henry Van Dyke's address on "The National Sin of Piracy"— but on grounds of protection of American authors from the underselling of foreign books. Thus in 1886, a memorial to Congress was presented by 144 American authors in the following terms: "The undersigned American citizens, who earn their living in whole or in part by their pen, and who are put at disadvantage in their own country by the publication of foreign books without payment to the author, so that American books are undersold in the American market, to the detriment of American literature, urge the passage by

---

such work under the conditions and for the terms specified in this title. The copyright secured by this title shall extend to the work of an author or proprietor who is a citizen or subject of a foreign State or nation only:

"(a) When an alien author or proprietor shall be domiciled within the United States at the time of the first publication of his work; or

"(b) When the foreign State or nation of which such author or proprietor is a citizen or subject grants, either by treaty, convention, agreement, or law, to citizens of the United States the benefit of copyright on substantially the same basis as to its own citizens, or copyright protection, substantially equal to the protection secured to such foreign author under this title or by treaty; or when

such foreign State or nation is a party to an international agreement which provides for reciprocity in the granting of copyright, by the terms of which agreement the United States may, at its pleasure, become a party thereto.

"The existence of the reciprocal conditions aforesaid shall be determined by the President of the United States, by proclamation made from time to time, as the purposes of this title may require." (Act of Mar. 4, 1909, c. 320, § 8, 35 Stat. 1077, 17 U.S.C.A. § 8. An amendment of Dec. 18, 1919, c. 11, 41 Stat. 369, added a proviso allowing the registration of works produced by such foreign citizens during the duration of the World War for a period of fifteen months after the date of the President's proclamation of peace.)

Congress of an International Copyright Law, which will protect the rights of authors, and will enable American writers to ask from foreign nations the justice we shall then no longer deny on our own part." Putnam, op. cit. p. 107; Bowker, Copyright; Its History and Its Law (1912), p. 359.

By 1886, as Mr. Putnam says (op. cit. p. 46), it had become "not so much a question whether there should or should not be an International Copyright, but simply what form the law should take." The first bill reported by the Judiciary Committee merely omitted the previous limitation restricting copyright to citizens or residents of the United States. In the report of the Committee on Patents of the House of Representatives, accompanying the bill which later became the Act of March 3, 1891, 26 Stat. 1106—known as the International Copyright Act—it was said that "substantially all the world, except Great Britain and the United States, treat foreigners and citizens alike in the matter of copyright," and that the Queen was empowered by law "to establish reciprocity with us if we will permit it, and we stand alone in rejecting and refusing overtures." H.R.Report to accompany H.R.10881, June 10, 1890, quoted in full in Putnam, op. cit. pp. 76–130. Here we see the reason for the reciprocity provision which had long been advocated by many, as by President Arthur in his message of December, 1884, and which was added to the Act. It was to put the United States in a position where it could bargain with other nations, especially with Great Britain, to obtain equal treatment in those countries for American citizens.

Indeed, the form in which the Act of 1891 was passed suggests the intent to make an all-inclusive grant of copyright protection, perhaps even more clearly than does the present statute. Sections 1 and 2 of that Act, 26 Stat. p. 1106, c. 565, were in the form of amendments to Sections 4952 and 4954, Rev.Stat.1878, and struck from them the limitation of copyright privileges to citizens or residents of the United States. The reciprocity provision applying "to a citizen or subject of a foreign state or nation" appeared only in a new and separate section at the end of the statute, Section 13, 26 Stat. 1110. Cf. Bowker, op. cit. pp. 363–364.

But the present statute, passed in 1909, was intended to work no change in this regard; the report of the House Committee on Patents in 1909 stated that "the first part of section 8 makes no change in existing law"; subsection (a) was intended to give to a foreign author actually domiciled here when his work was first published "all the rights we give to our own citizens even though he be a citizen of a foreign state" which does not reciprocate; and "subsection (b) is intended, with some slight modifications, to be declaratory of the provisions of the act of March 3, 1891." H.R.Rep. No. 2222, to accompany H.R.28912, 60th Cong., 2d Sess., Feb. 22, 1909, at p. 10.

In 1904, the Act of 1891 was construed, in harmony with the view we have taken of it, by Attorney General—later Mr. Justice—Moody. In an opinion to the Secretary of War he held that inhabitants of the Philippine Islands were entitled to the benefits of the statute, though they were not citizens or subjects of a foreign state or nation. Further, they were not citizens or residents of the United States and must pay fees accordingly, under § 4958, Rev.Stat., as amended by § 4 of the Act of 1891, 26 Stat. 1108. 25 Op.Atty. Gen. 179, 181, 182.

Outside of Attorney General Moody's opinion, there is little in the way of direct authority on the matter, undoubtedly because the question has not previously been important. Defendants refer to general statements, apparently contrary to the construction suggested, in Ladas, The International Protection of Literary and Artistic Property (1938), p. 703, and Weil, Law of Copyright (1917), pp. 260–261; but it is doubtful if these indicate anything more than that the authors had not thought of the problem. So, too, the rules of the Copyright Office (Rules and Regulations, 2(1), 17 U.S.C.A. following section 53) dealing with persons who may secure copyright do not cover this specific case; but this omission did not control or limit departmental practice in issuing certificates of registration, as this very case shows.

Any other result than this would be unfortunate, for it would mean that stateless aliens cannot be secure in even their literary property. True, the problem of statelessness has only become acute of late years, but it promises to become increasingly more difficult as time goes on. The rule contended for by the defendants would mean that the United States, contrary to

its general policy and tradition, is putting another obstacle in the way of survival of homeless refugees, of whom many have been students and scholars and writers. Defendants suggest that this class must be very limited in numbers, since it is said that, by the exception of subsection (a) of the statute, such refugees when domiciled in this country may secure the protection of the copyright law. But that does not seem a possible reading of the provision, once we have conceded defendants' original premise that the first sentence of the statute does not apply to aliens. For the second sentence by its terms limits all the remaining provisions of the section, including that dealing with aliens domiciled here, to an author or proprietor "who is a citizen or subject of a foreign State or nation only." In fact, this means a limitation upon the rights of aliens going beyond those existing prior to the International Copyright Act of 1891. Plaintiff's reading of the statute avoids this unfortunate restriction on the privileges of resident aliens; it makes the statute a consistent and complete authorization of protection to all authors, as its protagonists intended.

We conclude, therefore, that the book in question was subject to copyright and was properly copyrighted in this country.

Second. Defendants attack the plaintiff's title to the book on the grounds that no assignment from the author to the German publisher has been shown, and that the grant from this publisher to the plaintiff is a limited one and defectively executed. It appears from the various papers before us that Adolf Hitler was the author of the book in question, and that Franz Eher Nachfolger G.m.b.H. has published the work in Germany. The latter firm claimed to be the proprietor and owner of the copyright in its application for copyright in this country in 1925 and 1927. Under date of July 29, 1933, it executed with the plaintiff what is described as a General Department Royalty Contract, an extensive and detailed contract in seventeen numbered paragraphs covering eighteen folios of the printed record. The main granting paragraph is as follows (following designations of "Franz Eher Verlag of Munich, Germany," as "the Proprietors," and "Houghton Mifflin Company of Boston, Massachusetts," as "the Publishers"): "The Proprietors hereby grant and assign to the Publishers the volume rights of a work the subject or title of which is Mein Kampf, by Adolf Hitler; together with any existing copyrights thereof, and with the exclusive right and power in their name or in the name of the Proprietors to take out copyright thereof in the United States; and to publish and sell said work in editions, abridgments, and selections during the term of any copyright and during any renewal, continuation, or extension thereof accruing to the Proprietors, under the present or any future Act of Congress; the Proprietors agreeing to secure any renewal, continuation, or extension of copyright which shall accrue to them, under the present or any future Act of Congress, and to grant and assign the same to the Publishers."

The next paragraph of this contract contains an extensive warranty by the Proprietors of "their sole ownership of the work and their full power to make the grant," and their agreement "to hold harmless and defend the Publishers against any claim by reason of any violation of another copyright." Further paragraphs cover in detail matters such as those of author's royalties, statements of account and payments, and assignment and termination of the contract. There are provisions that "the Publishers shall have the first offer of the Author's next literary work intended for publication in book form," and that "the Publishers may publish or permit others to publish such selections from said work as they think proper to benefit its sale, without compensation to the Proprietors." Even the matter of illustrations is covered—photographs, pictures, maps, and other material are to be supplied by the Proprietors, who are also to prepare or pay for an index.

On its face, therefore, this appears to be a carefully drawn document intended to transfer all American rights to publish and sell this work. Defendants assert, however: (1) that it does not appear that Adolf Hitler, the author, had made any assignment of the work to the Proprietors, Franz Eher Nachfolger G.m.b.H.; (2) that the agreement was signed only in the firm name, and not also in the name of some individual officer of the limited partnership, and was not acknowledged before some consular officer, as provided in the Copyright Law, 17 U.S.C.A. § 43; and (3) that, since the document did not purport to assign television, radio, dramatic, and moving picture rights, the transfer was only partial and therefore was to be con-

strued as a mere license, requiring this action to be brought in the name of the licensor, Eher.

■ It is to be noted that, if an analogy is to be drawn between literary property and ordinary chattels, this technical defense cannot prevail, since possession of the manuscript by the German publishers is evidence of ownership, and the transfer in question is sufficient to convey a title good as against third persons, without any rights in the premises. That analogy has been asserted and relied on in the cases. Callaghan v. Myers, 128 U.S. 617, 658, 9 S.Ct. 177, 32 L.Ed. 547; Gerlach-Barklow Co. v. Morris & Bendien, 2 Cir., 23 F.2d 159, 161. We think it is sound and justifies the plaintiff's claim.

■ Since Adolf Hitler did not himself take out the copyright there was no need of a formal assignment by him. As the cases cited show, mere delivery of the manuscript to the publishers was sufficient. See Callaghan v. Myers, 128 U.S. 617, at page 658, 9 S.Ct. 177, 32 L.Ed. 547; Atlantic Monthly Co. v. Post Publishing Co., D.C. Mass., 27 F.2d 556, 558. Their possession of the manuscript which they have had and published and widely distributed and which they claim to own is ample evidence of a title good as against the defendants. Gerlach-Barklow Co. v. Morris & Bendien, supra; Drone on Copyright, 498, 499; 17 U.S.C.A. § 55. If necessary—as under the circumstances here present it is not—we might well take judicial notice that this book, in view of the powerful position of the author as Reichsfuehrer and Chancellor of the German Reich, could not be so widely distributed in Germany as it now is if the publishers had not the right to do so. Defendants are in error in their claim that judicial notice cannot be taken of matters not pleaded, for under ordinary rules, matters judicially noticed control and supersede matters alleged. Cooke v. Tallmann, 40 Iowa 133, and cases cited in Clark, Code Pleading, 167, 168. But resort to this rule is unnecessary, since the complaint is neither inconsistent nor inadequate in this regard. Hence, in any event, the title of the German publishers is adequate to sustain this proceeding.

■■ The possible failure to observe all the formalities of signing or acknowledging the document of transfer is at most only a matter of form going to the proof of its due execution. Such proof may be otherwise supplied, as here by affidavits in evidence. Ladas, op. cit. 801, discussing 17 U.S.C. § 43, 17 U.S.C.A. § 43. Whatever lack of signatures there may be according to German law, the assignment satisfies our requirements. M. Witmark & Sons v. Calloway, D.C., E.D.Tenn., 22 F.2d 412; Ladas, op. cit. 794, 795; Belford, C. & Co. v. Scribner, 144 U.S. 488, 504, 12 S.Ct. 734, 36 L.Ed. 514.

■ Finally, on the question whether the agreement was intended to be an assignment of copyright or only a license to use in certain restricted ways, there seems no possibility of doubt that the intention of the parties was to convey full rights. Indeed, they say that the Proprietors "grant and assign to the Publishers" "any existing copyrights thereof," with an exclusive right to take out copyright in the United States in their name or in that of the Proprietors. In American Tobacco Co. v. Werckmeister, 207 U.S. 284, 285, 297, 28 S.Ct. 72, 52 L.Ed. 208, 12 Ann.Cas. 595, the transfer of the "copyright" in a picture was held to be a complete assignment, rather than a mere license or personal privilege. It savors of the ridiculous to consider that, because the parties did not think of moving picture, television, and radio production in connection with this political treatise and did not make specific mention of them, this carefully drawn agreement shall be held ineffective to afford remedies in this country against piracy of the work. Defendants base their claim on the prominence given in the document to the assignment of "the volume rights" to the work. The meaning of this expression is not clear, and no reason is seen for reading it as intended to cover only a limited right, and then further as containing a negative implication restricting the other broad terms of the grant. At most, volume rights are but one of several species of rights enumerated, and the enumeration is intended to expand, not contract, the grant. Intention to assign the full copyright is apparent throughout the contract and effect should be given to this intention. Cf. In re Waterson, Berlin & Snyder Co., 2 Cir., 48 F.2d 704; Manners v. Morosco, 2 Cir., 258 F. 557, 559, reversed on other grounds 252 U.S. 317, 40 S.Ct. 335, 64 L.Ed. 590.

Under these circumstances we do not feel it necessary to discuss the question, as to which there is some difference of view, how far an assignee of some, but not all, rights in literary property may sue. The

matter is discussed, with references to the authorities, in Ladas, op. cit. 194–197; Weil, op. cit. 548–550. The desirability of recognizing partial assignments, as is usual in other forms of property, would seem apparent; but perhaps under the statute we are held to the view that "the author's rights may not be divided except as the statute recognizes a division." Public Ledger v. New York Times, D.C.S.D.N.Y., 275 F. 562, 564. This case, however, dealt only with an application to copyright. It was affirmed on slightly different grounds in 2 Cir., 279 F. 747, and certiorari was denied in 258 U.S. 627, 42 S.Ct. 383, 66 L. Ed. 798.

Under the circumstances of entire absence of title or right in the defendants, their claim that the equities are in their favor—that they are engaged in a service of great social value in thus publishing this book—seems indeed bold.

The order is reversed and the cause remanded to the District Court with instructions to issue the preliminary injunction as prayed for.

Reversed.