CARNEGIE PRODUCTIONS, INC., PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 1914–68. Filed February 5, 1973.

---

*Peter M. Fass, Jules Brody, Maurice S. Spanbock,* and *Reginald Leo Duff,* for the petitioner.
*Stanley J. Goldberg,* for the respondent.

QUEALY, *Judge:* The Commissioner determined deficiencies in petitioner's income taxes and additions to the tax thereon in the amounts and for the taxable years shown below:

| TYE Jan. 31— | Deficiency | Addition to tax under sec. 6651(a) [1] |
|---|---|---|
| 1962 | $21, 712. 89 | $5, 428. 22 |
| 1963 | 998. 75 | |
| 1964 | 36, 504. 38 | |
| 1965 | 27, 554. 57 | |
| Total | 86, 770. 59 | 5, 428. 22 |

In the redetermination of the tax liability of the petitioner for the taxable years set forth above, the principal issue presented for decision relates to the question (1) whether the petitioner was entitled to claim depreciation on account of a certain motion picture entitled "The Goddess" and, if so, (2) the method and useful life to be applied in computing such depreciation. A decision with respect to that issue will be determinative of the other issues relating to the petitioner's reporting of the receipts and expenses resulting from the distribution of the picture.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Carnegie Productions, Inc. (hereinafter referred to as the petitioner), is a corporation organized under the laws of the State of New York. At all times material herein, its principal place of business was in New York, N.Y. The petitioner filed its Federal corporation income tax returns on the accrual basis for the fiscal years ended January 31, 1962 to 1965, inclusive, with the district director of internal revenue, Manhattan District, New York.

Paddy Chayefsky owned 67 percent and Susan Chayefsky, his wife, owned 33 percent of the issued and outstanding stock of the petitioner.

On April 19, 1956, Paddy Chayefsky entered into a letter agreement with Columbia Pictures Corp. (hereinafter referred to as Columbia)

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

to produce and deliver to Columbia a new and original motion picture subsequently entitled "The Goddess." The letter agreement incorporated by reference the terms and conditions for the production and distribution of another motion picture entitled "Middle of the Night" except as specifically modified therein. Chayefsky was author of the screenplay for "Middle of the Night" and that picture had been produced by Sudan Co., Inc., the stock of which was owned by him.

By agreement dated July 3, 1957, Chayefsky assigned to petitioner his right, title, and interest in the letter agreement relating to the picture entitled "The Goddess," with the consent of Columbia. In order to obtain such consent, Chayefsky further agreed to perform for petitioner the services which he had been obligated to perform pursuant to said letter agreement and to vest in petitioner all of his right, title, and interest therein.

Pursuant to the letter agreement, including the terms and conditions embodied therein (hereinafter referred to as the production-distribution agreement), the parties thereto agreed as follows:

(1) Petitioner would produce a new and original feature-length motion picture to be a class A talking picture of first-class quality in black and white. Chayefsky would author the screenplay and select the producer and the principal actors and actresses after consultation with Columbia. An amount not to exceed $75,000 would be paid to Chayefsky as associate producer and writer of the screenplay for his services. Petitioner further agreed to seek or to compel performance of any employment agreements entered into in the production of said motion picture and, upon the request of Columbia, to prosecute any legal or equitable action to enforce such agreements. In the event of the failure of petitioner to do so, Columbia reserved the right to sue in the name of petitioner.

(2) Carnegie would submit to Columbia the final screenplay upon which the picture is based immediately upon completion and give good faith consideration to any recommendations made by Columbia, but petitioner's decision was final. The petitioner would also submit a budget of the estimated costs and expenses to be incurred in the production of the picture, which would be subject to approval by Columbia. In the event that the actual costs exceeded the amount budgeted, petitioner's participation in the net proceeds from the distribution of the picture would be reduced in accordance with a predetermined formula. If the costs exceeded the budgeted amount and the petitioner was unable to complete the picture, Columbia reserved the right, at its election, to take over supervision of the production of the picture. In such event, Columbia was obligated to advance all funds necessary to complete the picture.

(3) Columbia would provide the funds for the production of the picture either by direct loans to the petitioner or by guaranteeing pe-

titioner's loans from such banks as might be approved by Columbia. Interest was chargeable on all loans at the prevailing rate. Disbursements of the funds borrowed by petitioner would be subject to control jointly by petitioner and Columbia. The amounts borrowed by petitioner would be repayable only out of the net profits from the distribution of the picture. Petitioner assumed no liability for the repayment of any amount.

(4) As security for the performance of the production-distribution agreement and for the repayment of any and all sums advanced by Columbia, petitioner assigned and granted all of its rights, title, and interest in the picture to Columbia and granted Columbia a first and continuing lien thereon. In the event that Columbia was not repaid for any and all sums advanced prior to the expiration of 7 years from the date of the production-distribution agreement, Columbia had the right to foreclose the lien in order to secure repayment of all sums then unpaid. In the event of a breach of the agreement by petitioner, Columbia then had the right and option to declare all sums advanced immediately due and payable and to foreclose the lien.

(5) Upon completion and approval of the picture, Columbia would acquire the sole, exclusive, and irrevocable right to rent, lease, license, exhibit, distribute and otherwise dispose of, or trade and deal in and with the picture, and all rights therein of every kind and nature throughout the entire world, for the duration of the copyright but in no event less than 28 years, which term is renewable.

(6) The proceeds realized by Columbia from the sale or distribution of the picture would be allocated, in the order of priority to the payment of fees and taxes, to the payment of distribution fees at the amounts or percentages specified in the agreement, to reimburse Columbia for amounts expended and advances made in the distribution of the picture, to repay bank loans with interest, to repay amounts loaned by Columbia or paid by Columbia on account of bank loans with interest, and for any and all other amounts advanced or expended by Columbia in the production of the picture, including overhead. Following the payment of such amounts, any amount remaining would be distributed 50 percent to Columbia and 50 percent to Carnegie, with the percentage due petitioner to be adjusted by formula in the event that the production costs exceeded the budget.

(7) In the event that Columbia committed a breach of the production-distribution agreement and/or failed to make any payments provided therein, and after notice by petitioner of such breach, petitioner had the right to proceed against Columbia for money damages. However, in no event were the rights acquired by Columbia subject to termination notwithstanding such breach or default on Columbia's part.

(8) The parties agreed that the contract in no way shall constitute a partnership or a joint venture, nor shall either party be bound or become liable because of any representation, action, or omission by the other party. Columbia recognized that for all purposes thereunder, petitioner was an independent contractor producing the picture for distribution by Columbia.

By letter dated July 17, 1957, petitioner advised Columbia that the estimated budget cost for "The Goddess" would be $696,298. Upon approval of such budget by Columbia, provisions were thereupon made to provide the necessary financing. Petitioner thereupon obtained a loan of $375,000 from the Security First National Bank of Los Angeles, bearing interest at the rate of 5 percent per annum payable quarterly, with provision that the full amount of principal and interest remaining unpaid shall be due and payable on July 15, 1959. Columbia undertook to advance the remaining funds necessary for the production of "The Goddess."

The loan to the petitioner from the Security First National Bank of Los Angeles was evidenced by a promissory note, dated August 2, 1957, repayment of which by petitioner was subject to the following:

In the event of a default in the payment of the principal or interest of this note, the remedies of the holder hereof shall be limited to satisfying such indebtedness out of the production share of the gross receipts (as such term is defined in the Production-Distribution Agreement dated April 19, 1956 between Columbia Pictures Corporation and Sudan Company, Inc.).

In order to induce the Security First National Bank of Los Angeles to make said loan to petitioner, Columbia unconditionally guaranteed repayment of the principal and interest of said note at maturity, irrespective of any limitation of liability of petitioner. Columbia further agreed that until said note and interest had been paid in full, the proceeds from the distribution of the picture, after payment of distribution fees and expenses, would be paid to the bank.

In accordance with the agreement between petitioner and Columbia, the motion picture entitled "The Goddess" was completed and released for public viewing in motion-picture theaters in May 1958. The total expended by petitioner in the production of the picture amounted to $735,400.73. These costs included the sum of $50,000 paid to Chayefsky pursuant to the agreement for his services as author of the screenplay and associate director of the picture. The remaining $25,000 due to Chayefsky was deferred.

Of the total of $735,400.73 chargeable to the production of the picture, $375,000 represented funds secured from the Security First National Bank of Los Angeles and the balance of $360,400.73 was advanced from time to time by Columbia. Petitioner's note of $375,000 plus interest was thereafter paid by Columbia in installments with final payment on July 17, 1959.

Upon its initial showing, the motion picture entitled "The Goddess" was acclaimed for its artistic merit. However, within a few months thereafter, it became apparent that the net profits from its distribution probably would not be sufficient to repay the amounts expended in its production.

During the period from the picture's release to January 31, 1965, the income and distribution of the picture were as follows:

| Year ended/ cumulative | Gross income | Distribution fees | Gross income less fees | Distribution expenses | Net |
|---|---|---|---|---|---|
| 1/31/59 | $262,316.24 | $74,025.28 | $188,290.96 | $238,204.69 | ($49,913.73) |
| 1/31/60 | 83,452.00 | 28,485.22 | 54,966.78 | 34,792.16 | 20,174.62) |
| Cumulative | 345,768.24 | 102,510.50 | 243,257.74 | 272,996.85 | (29,739.11) |
| 1/31/61 | 33,610.94 | 11,776.36 | 21,834.58 | 10,289.39 | 11,545.19 |
| Cumulative | 379,379.18 | 114,286.86 | 265,092.32 | 283,286.24 | (18,193.92) |
| 1/31/62 | 12,125.70 | 4,247.61 | 7,878.09 | (795.86) | 8,673.95 |
| Cumulative | 391,504.88 | 118,534.47 | 272,970.41 | 282,490.38 | (9,519.97) |
| 1/31/63 | 9,414.61 | 3,008.49 | 6,406.12 | 11,346.70 | (4,940.58) |
| Cumulative | 400,919.49 | 121,542.96 | 279,376.53 | 293,837.08 | (14,460.55) |
| 1/31/64 | 6,228.03 | 2,040.97 | 4,187.06 | 2,544.92 | 1,642.14 |
| Cumulative | 407,147.58 | 123,583.93 | 283,563.59 | 296,382.00 | (12,818.41) |
| 1/31/65 | 95,853.61 | 33,503.21 | 62,350.40 | 3,035.14 | 59,315.26 |
| Cumulative | 503,001.13 | 157,087.14 | 345,913.99 | 299,417.14 | 46,496.85 |

In its corporation income tax return for the taxable year ended January 31, 1960, petitioner reported a net loss of $469,583.80. In computing said loss, petitioner deducted the sum of $460,053.80 as depreciation on account of the motion picture entitled "The Goddess" and the sum of $9,000 on account of legal and accounting fees relating thereto. The depreciation claimed was computed as follows:

| | |
|---|---|
| Total production costs per agreement | $735,400.73 |
| Less: Legal and accounting fees | 9,000.00 |
| Cost of picture | 726,400.73 |
| Less: Residual value (5 percent) | 36,320.03 |
| Depreciable cost | 690,080.70 |
| Depreciation allowable 12/18 | 460,053.80 |
| Remaining cost | $230,026.90 |

In addition, there was attached to said return for the taxable year ended January 31, 1960, a schedule showing "Motion Picture Film Rentals" of $243,257.74 less "Distribution Expenses" of $272,996.75 resulting in a loss of $29,739.11 on account of rental of the motion picture "The Goddess," with the following notation:

NOTE: The above loss is not deducted on this tax return inasmuch as the contract with the Distributor (Columbia Pictures Corporation) does not obligate Carnegie Productions, Inc., to reimburse the Distributor for Distribution Expenses incurred in excess of Income Received.

The amounts reflected in the schedule were the *cumulative* rentals after distribution fees and *cumulative* distribution expenses to January 31, 1960.

In its corporation income tax return for the taxable year ended January 31, 1961, petitioner reported a net loss of $230,089.99. In computing said loss, petitioner deducted the remaining cost of $230,026.90 as depreciation on account of the motion-picture film "The Goddess." There was also attached to said return a schedule showing "Motion Picture Film Rentals" of $265,092.32 less "Distribution Expenses" of $283,286.24 resulting in a loss of $18,193.92 on account of the rental of the motion picture "The Goddess" with same notation as to why this loss was not deducted on the return. Again, the amounts reported were the cumulative rentals and expenses to January 31, 1961.

In its corporation income tax return for the taxable year ended January 31, 1962, petitioner reported gross receipts of $61,865.49 which included gross income from the rental of the motion picture "The Goddess" and reported cost of goods sold in the amount of $38,572.84 which included distribution fees of $4,247.61 on account of said rentals, thereby reflecting income in the sum of $7,878.09. In said return, petitioner deducted a net operating loss of $699,673.79 carried forward from prior taxable years.

In its corporation income tax return for the taxable year ended January 31, 1963, petitioner reported gross receipts of $48,459.58 which included gross income from the rental of the motion picture "The Goddess" in the amount of $9,414.61 and reported cost of goods sold of $36,904.56 which included distribution fees on account of said rentals in the amount of $3,008.49. Petitioner also claimed other deductions of $12,744.61 which included distribution expenses of $11,346.70 on account of said rentals with the result that a net loss of $4,940.58 for the taxable year ended January 31, 1963, was charged against other income. In addition, the petitioner claimed a net operating loss deduction in the amount of $690,148.06 computed as follows:

NET OPERATING LOSS DEDUCTION

| | | |
|---|---|---|
| Net loss—FYE 1/31/59 | $25.00 | |
| Less: Applied to taxable income of FYE 1/31/62 | 25.00 | |
| Balance available | | 0 |
| Net loss—FYE 1/31/60 | 469,583.80 | |
| Less: Applied to taxable income of FYE 1/31/62 | 27,719.65 | |
| Balance available | | $441,864.15 |
| Net loss—FYE 1/31/61 (as filed) | 230,089.99 | |
| Add: Adjustment of distribution costs reflected as debit to surplus on tax return for FYE 1/31/62 | 18,193.92 | |
| | | 248,283.91 |
| Total | | 690,148.06 |

In its corporation income tax return for the fiscal year ended January 31, 1964, petitioner reported gross receipts of $119,466.85 which

included gross income from the rental of the motion picture "The Goddess" of $6,228.03 and reported cost of goods sold of $66,242.45 which included distribution fees on account of said rentals of $2,040.97. Petitioner also claimed other deductions of $14,761.71 which included distribution expenses on account of said rentals of $2,544.92. In addition the petitioner claimed a net operating loss deduction in the amount of $694,061.70, computed as follows:

NET OPERATING LOSS DEDUCTION

| | | |
|---|---|---|
| Net loss—FYE 1/31/59 | $25.00 | |
| Less: Applied to taxable income of FYE 1/31/62 | 25.00 | |
| Balance available | | 0 |
| Net loss—FYE 1/31/60 | 469,583.80 | |
| Less: Applied to taxable income of FYE 1/31/62 | 27,719.65 | |
| Balance available | | $441,864.15 |
| Net loss—FYE 1/31/61 (as filed) | 230,089.99 | |
| Add: Adjustment of distribution costs reflected as debit to surplus on tax return for FYE 1/31/62 | 18,193.92 | |
| | 248,283.91 | |
| Net loss—FYE 1/31/62 | 3,913.64 | |
| Total | 694,061.70 | |

In its corporation income tax return for the fiscal year ended January 31, 1965, petitioner reported gross receipts of $260,975.52 which included gross income from the rental of the motion picture "The Goddess" of $95,853.61 and reported cost of goods sold of $146,-561.98 which included claimed distribution fees on account of said rentals of $33,503.21. Petitioner also claimed other deductions of $13,-910.92 which included claimed distribution expenses on account of said rentals of $3,035.14. In addition, the petitioner claimed a loss deduction in the amount of $662,867.47, computed as follows:

NET OPERATING LOSS DEDUCTION

| | | | |
|---|---|---|---|
| Net loss—FYE 1/31/60 | | $469,583.80 | |
| Less: Amounts applied to taxable income— | | | |
| FYE 1/31/62 | $27,719.65 | | |
| FYE 1/31/64 | 31,194.23 | 58,913.88 | |
| Balance available | | | $410,669.92 |
| Net loss—FYE 1/31/61 | | | 248,283.91 |
| Net loss—FYE 1/31/63 | | | 3,913.64 |
| Total | | | 662,867.47 |

In his notice of deficiency, the respondent has disallowed the deductions claimed by the petitioner on account of depreciation of the production costs of the motion picture "The Goddess" in the amount of $460,053.80 for the taxable year ended January 31, 1960, and in the amount of $230,026.90 for the taxable year ended January 31, 1961, in computing the petitioner's net operating loss deduction for subsequent years. In addition, the respondent has excluded from gross receipts the rentals reported in the petitioner's returns on account of the distribution of the picture and disallowed as deductions the expenses relating to such distribution, including the deduction of $9,000 as legal and accounting expense for the taxable year ended January 31, 1960, on the grounds that the receipts and expenses were chargeable to Columbia.

In addition to contesting the respondent's determination with respect to the depreciation and other receipts and expenses attributable to the motion picture, by amendment to the petition the petitioner seeks to accrue and deduct during each of the taxable years 1960 to 1965, inclusive, interest at the rate provided for in the production-distribution agreement on the sum of $735,400.73 advanced by Columbia.

The petitioner was granted an extension to July 31, 1962, for the filing of its corporation income tax return for the year ended January 31, 1962. Said return was not filed until March 4, 1963. The petitioner has not established that the failure timely to file such return was due to reasonable cause.

OPINION

In this case, the Court must first determine whether the petitioner is entitled to recover, as depreciation or amortization under section 167, the production costs of the motion picture "The Goddess" amounting to $735,400.73. A deduction for depreciation of property used in a trade or business or held for the production of income is allowable under section 167 which provides, in part, as follows:

SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescense)—

(1) of property used in the trade or business, or
(2) of property held for the production of income.

Section 167(g) [2] of the Code provides that the basis for the depreciation deduction is the adjusted basis provided in section 1011 for pur-

[2] SEC. 167(g). BASIS FOR DEPRECIATION.—The basis on which exhaustion, wear and tear, and obsolescense are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property.

poses of determining gain or loss on the sale or other disposition of such property.

Section 1011(a) [3] provides that the basis is determined under section 1012, which provides that: "The basis of property shall be the cost of such property." In turn, the cost of such property is generally the amount paid for such property in cash or other property. Sec. 1.1012–1, Income Tax Regs.[4]

The petitioners' claim to depreciation is predicated on its role as producer of the picture under a so-called Production-Distribution Agreement between the petitioner and Columbia. Petitioner argues that it produced a depreciable property at a cost of $735,400.73,[5] albeit with borrowed money, and upon delivery of the picture to Columbia the petitioner had a basis in that amount, subject to recovery through depreciation, citing cases such as *Crane* v. *Commissioner*, 331 U.S. 1 (1947), and *Manuel D. Mayerson*, 47 T.C. 340 (1966). Following this logic, petitioner, beginning in its fiscal year 1962, undertook to reflect in its returns the net rentals from and expenses attributable to the distribution of the picture.

The respondent argues that Columbia was the real "owner" of the picture. The petitioner was merely an independent contractor engaged by Columbia to produce a picture. Columbia put up all the money. Once the picture was completed, petitioner was left with bare legal title and the right ultimately to share in any profits from the distribution of the picture. Since the petitioner invested nothing for that right, the respondent contends that the petitioner had nothing to depreciate.

By agreement, the petitioner undertook to produce a film to be entitled "The Goddess." The petitioner would contribute the services of Chayefsky who would write the screen play and act as "associate producer" of the picture. The sum of $75,000 would be paid to Chayefsky for such services.

Columbia undertook to provide the funds which would be required to produce the picture. It was contemplated from the outset that these funds would be supplied in part by a bank loan, repayment of which would be the responsibility of Columbia, and the remainder directly by Columbia. These advances would be recoverable solely out of the

---

[3] SEC. 1011. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) GENERAL RULE.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)), adjusted as provided in section 1016.

[4] Sec. 1.1012–1. Basis of Property.

(a) *General Rule.* In general, the basis of property is the cost thereof. The cost is the amount paid for such property in cash or other property. * * *

[5] Petitioner improperly deducted $9,000 of the total as a direct expense for legal and accounting. However, this amount was a part of the production costs agreed upon by the parties to the agreement.

net profits from the distribution of the picture. Petitioner assumed no liability for the repayment of any amount. Thus the total cost for the picture amounting to $735,400.73 came from Columbia, either directly or on account of its assumption of the obligation to repay the amount loaned by the bank.

The nature of the transaction is aptly characterized by both the petitioner and the respondent as a "production-distribution agreement." In other words, there are embodied in the agreement two separate contracts. One contract governs the production of the picture. The other contract governs the distribution of the picture.

Under the production contract, the petitioner agreed to provide the services of Chayefsky, who would write a screenplay and supervise the production of a motion-picture film. The petitioner was given the right to make all decisions with respect to the filming and content of the picture. Columbia would supply the funds, the disbursement of which would be subject to the joint control of the petitioner and Columbia.

Once the picture was completed, the roles of the parties were reversed. Columbia acquired the sole, exclusive, and irrevocable right to rent, lease, license, exhibit, distribute, and otherwise dispose of, or trade and deal in and with the picture. At most, petitioner was left with the bare legal title and the right to share in the profits, if any, from the distribution of the picture after there had first been repaid all loans, advances, investments, and expenses incurred by Columbia, with interest thereon.

Notwithstanding the contractual provision negativing any intent to form a joint venture, the contract whereby Chayefsky would contribute his services and Columbia would provide the financing for the production of the motion picture, would most likely be so characterized for Federal tax purposes. *Tompkins* v. *Commissioner*, 97 F. 2d 396 (C.A. 4, 1938) ; *Kleinschmidt* v. *United States*, 146 F. Supp. 253 (D. Mass. 1956) ; *Harry Klein*, 18 T.C. 804 (1952) ; cf. *Lucia Chase Ewing*, 20 T.C. 216 (1953), affirmed on other grounds 213 F. 2d 438 (C.A. 2, 1954). In this respect, the facts are distinguishable from the facts in *Lucia Chase Ewing, supra*, where the role of the taxpayer who advanced the funds was limited to just that.

Irrespective, however, of whether during the production phase of the agreement, the petitioner is regarded as a joint venturer, an independent contractor, or as sole owner of the motion picture, once the picture had been completed and acepted by Columbia, the only remaining interest of the petitioner in the picture was to share in any future profits.

By the express terms of the "production-distribution agreement," Columbia was given the "sole, exclusive and irrevocable right to rent,

lease, license, exhibit, distribute and otherwise dispose of, or trade and deal in or with the picture and all rights therein of every kind and nature" and those rights granted Columbia expressly included "all so-called 'theatrical' as well as 'non-theatrical' rights in the picture (as those terms are commonly understood in the motion picture industry)." Such an unrestricted transfer of rights by the petitioner operates as an assignment of the full copyright in the motion picture. *Houghton Mifflin Co.* v. *Stackpole Sons, Inc.*, 104 F. 2d 306 (C.A. 2, 1939), certiorari denied 308 U.S. 597 (1939) ; *Murphy* v. *Warner Bros. Pictures*, 112 F. 2d 746 (C.A. 9, 1940). In addition, unlike the situation in *G. Ricordi & Co.* v. *Paramount Pictures*, 189 F. 2d 469 (C.A. 2, 1951), certiorari denied 342 U.S. 849 (1951), where it was held that the initial holder of the copyright may renew and transfer the rights thereunder on his own behalf where the original contract of sale is silent as to renewal, here the rights in the picture for the renewal period of the copyright were expressly granted to Columbia as well. See also *Edward B. Marks M. Corp.* v. *Charles K. Harris M. P. Co.*, 255 F. 2d 518 (C.A. 2, 1958), certiorari denied 358 U.S. 831 (1958) ; *Von Tilzer* v. *Jerry Vogel Music Co.*, 53 F. Supp. 191 (S.D. N.Y. 1943), affirmed sub nom. *Gumm* v. *Jerry Vogel Music Co.*, 158 F. 2d 516 (C.A. 2, 1946). Columbia's right to renew in his name could only be extinguished, if at all, by the death of Chayefsky prior to the expiration of the initial term. See *Miller Music Corp.* v. *Daniels, Inc.*, 362 U.S. 373 (1960).

All rights that Chayefsky or petitioner held in "The Goddess" were thus transferred irrevocably to Columbia. Columbia took over complete control of the distribution of the picture and undertook to discharge all obligations incurred in its production. From the terms of the contract and an examination of the actions of the parties, the conclusion is inescapable that Columbia became the real "owner" of "The Goddess." The petitioner retained no incidents of ownership upon which the allowance of a deduction for depreciation may be based.

Further, while it might be said that the petitioner retained a right or interest in the profits from "The Goddess," if any such profits were ever realized, any amortization or depreciation thereof would be allowable only to the extent of the petitioner's cost or basis in that right. Since petitioner's basis was "zero" there was nothing to amortize.

By amendment to the petition, the petitioner also seeks to accrue and to deduct interest on account of the production costs paid by Columbia. Not only has such interest never been paid, but it is highly unlikely that it ever will be. There is nothing to accrue. *Pierce Estates* v. *Commissioner*, 195 F. 2d 475 (C.A. 3, 1952) ; *American Bemberg Corporation* v. *United States*, 253 F. 2d 691 (C.A. 3, 1958) ; *Guardian Investment Corporation* v. *Phinney*, 253 F. 2d 326 (C.A. 5, 1958).

In order that there be interest, it is axiomatic that there must be "indebtedness." Here, there was no indebtedness. If the motion picture "The Goddess" should ultimately produce sufficient profit to repay Columbia for its advances, the retention thereafter by Columbia of an amount equivalent to interest on such advances would not constitute "interest" but merely a measure of the amount Columbia is entitled to retain before the petitioner receives anything.

With respect to the other adjustments set forth by the respondent in his notice of deficiency, either (1) petitioner has presented no proof of error or (2) adjustments follow from the determination that the petitioner had neither income nor expenses from the distribution of the motion-picture film "The Goddess."

Since the petitioner has failed to establish that the delay in the filing of petitioner's return for the year ended January 31, 1962, was due to reasonable cause and not to willful neglect, the respondent's determination of an addition to the tax under section 6651(a) must be sustained. *Delores Bussabarger*, 52 T.C. 819 (1969); *Estate of Saul Krampf*, 56 T.C. 293 (1971).

*Decision will be entered for the respondent.*

Reviewed by the Court.

---

STERRETT, *J.*, concurring: I view the relationship of petitioner to Columbia Pictures as that of an independent contractor. In such capacity petitioner acquired no basis in "The Goddess"; hence I would reach the same ultimate conclusion as the majority herein. However, I reserve judgment on whether, if the facts were otherwise and a sale had occurred, petitioner would then be entitled to a cost basis.

TANNENWALD and HALL, *JJ.*, agree with this concurring opinion.