Robert V. **KLEINSCHMIDT**

v.

**UNITED STATES** of America.

Civ. A. No. 54-510.

United States District Court
D. Massachusetts.

Oct. 18, 1956.

Motion for New Trial Denied
Dec. 5, 1956.

John F. Cremens, Boston, Mass., for plaintiff.

Arthur Biggins, Tax Division, U. S. Dept. of Justice, Washington, D. C., Anthony Julian, U. S. Atty., Andrew A. Caffrey, Arthur I. Weinberg, Asst. U. S. Attys., Boston, Mass., for defendant

ALDRICH, District Judge.

This is an action to recover income taxes for the calendar years 1944–47 inclusive. The taxes were duly paid in the amount disclosed on the returns. Taxpayer later filed claims for refund, which were not allowed, and thereafter this action was seasonably brought. Taxpayer is a mechanical engineer and an authority in the field of thermo-dynamics. Since 1930, exclusive of his period of service in the Navy during World War II, he has divided his time between teaching and practicing as a consulting engineer. In one of his returns he described his occupation as "inventor," but I find on the evidence that this was not his regular business. With one exception his inventions that have ripened into patents were incidental to his employment as a consulting engineer, and became forthwith the property of his current employer. The exception, and the invention involved in the present dispute, is the Kleinschmidt Still, so-called, a vapor-compression distillation device designed by taxpayer under the following circumstances.

Sometime in December, 1935 one of the officials of Arthur D. Little, Inc., a Massachusetts research and engineering firm, hereafter called Little, by whom taxpayer was retained from time to time on a per diem consulting basis, told taxpayer he had heard the Marine Corps was interested in a device for distilling sea water which would meet certain requirements. Little had no present personal concern in the matter and informed taxpayer simply because it knew of his general interests. In point of fact taxpayer had previously considered this subject to such an extent that he was then able, in a matter of days, to perfect plans of what seemed to be the very device desired. The comparative simplicity of his idea, and this rapidity of its execution, caused Little to regard taxpayer's design with skepticism. Taxpayer informed Little that if it would make its facilities and some materials available, he would undertake to prove to it that the device would work. Little complied. By the end of February, 1936 taxpayer completed a working pilot model. Subsequently a number of patents were obtained, the basic one being No. 2,185,595, issued January 2, 1940, which taxpayer transferred to Little in the application stage, and which was eventually licensed to the government on a royalty basis. One third of the royalties were paid to taxpayer. He now seeks to have them regarded as a return of capital, to result in a long-term capital gain. The government contends that the transaction was not a sale, but a joint venture between the parties.

When taxpayer invented the still he had no contractual relationships, and no thought of being paid by Little or anyone else. As soon as the pilot model was demonstrated, Little became interested, and on March 27, 1936 the parties entered into an oral understanding, which was reduced to writing in an informal memorandum. This provided that each would thereafter do "contingent work" on the apparatus;

"Time spent on the problem will be handled just as for clients *if and when* the cost can be collected from

other parties, without obligation on either side." (Italics supplied.)

The memorandum further provided that patents "obtained under this arrangement will be held by Little *with an agreement in the assignment*[1] to pay [taxpayer] one-third of any gross royalties or other divisible compensation for use of the patent by others or in event of its sale;" that Little should bear the cost of patent applications, and any sales expense, and that taxpayer, if available, should be employed by any clients for consultation work.

An application was filed with the patent office on December 9, 1936, for the original patent. The first office action took place in March, 1937. On June 7, 1937, taxpayer delivered to Little a full assignment of the invention. Also on that date the parties executed a formal agreement which recited the application for the patent and that the parties desired that Little "shall for their mutual benefit undertake the exploitation of the said invention or inventions upon the terms and conditions hereinafter stated." These terms were the same as those contained in the 1936 memorandum, except that no reference was made to taxpayer's obligation to contribute contingent time, nor to Little's obligation, in case there should be a client who would contract in advance to pay for consulting work, to endeavor to get taxpayer such uncontingent employment. This did not mean that these matters were lost sight of. It will be recalled that the parties originally contemplated that the provisions for royalties would be in the assignment itself. I believe the mechanical separation made by patent counsel into two documents explains why the June 7, 1937, agreement did not repeat the rest of the 1936 undertaking. Counsel was thinking only about the direct

patent aspects. But as late as May 1, 1940 a memorandum executed by the parties with relation to work being done by taxpayer in connection with two sample stills being manufactured by Little in its attempt to interest the Navy in the device referred back to 1936. This memorandum recited that while taxpayer had been paid for certain work,

"Payment for time spent by [him] after this date is contingent * * * [to] be paid only if and when such cost can be collected from other parties. This coincides with the memorandum of March 27, 1936 * * * To summarize the foregoing, *the situation in regard to the patent understanding is unchanged* and on the two stills Little will bear the out-of-pocket expenses while [taxpayer] *will contribute his time.*" (Italics supplied.)

The March 27, 1936 agreement, in other words, still remained very much alive. There was other evidence that taxpayer was not shut of the affair.

Taxpayer contends that the 1936 agreement was not a sale. It is, of course, essential for him to show that the 1937, and only the 1937, agreement was a sale in order to establish a six-months holding period. Under other circumstances the holding period might present an interesting question. Following March, 1936 taxpayer was obligated to sell to Little, if the ultimate transaction constituted a sale at all, upon terms already defined. Little's obligations, also, were substantially stated. Execution of the actual assignment was merely postponed until it more clearly appeared that the invention had value. In other words, "if and when" it appeared that taxpayer in fact had a capital asset, it had been fully and irretrievably contracted away by the March, 1936 agreement.[2] To allow tax-

1. Italics supplied.

2. There was some suggestion in the testimony that this was a "gentleman's agreement," implying, perhaps, that it was not binding. I do not so find. If the invention did not prove patentable and marketable, obviously nothing would

have come of the agreement, as there would have been, in effect, no subject matter. But if it developed as hoped, both parties were obligated. I do not regard this as conditional. If it was, far more conditional contracts have been upheld. Cf. Scott v. Moragues Lumber Co., 202

payer the benefit of a sale with this longer holding period under such circumstances might well be questionable. Cf. Oesterreich v. Com'r, 9 Cir., 226 F.2d 798; Kenyon v. Automatic Instrument Co., 6 Cir., 160 F.2d 878; Springfield Plywood Corp. v. C. I. R., 15 T.C. 697.

■ I believe, however, that neither the March, 1936 agreement, nor the June, 1937 agreement and assignment was a sale in any real sense.[3] I find that the 1937 documents were simply the carrying out of one contemplated step of an enterprise undertaken in 1936. Taxpayer was not personally fitted to market and dispose of his invention, while Little was. Likewise, the government would not, or would prefer not, deal with an individual such as taxpayer, but it would deal with Little. If only for convenience the legal title to the patent preferably had to be in one person, and Little was the logical one. On the other hand, neither taxpayer nor Little wanted a cleavage between himself and the invention, for in June, 1937 disposition of it had scarcely begun. In point of fact, nearly four more years of effort were required. While Little was to be the primary "exploiter," taxpayer, also, had his role.

A joint venture is an agreement in the nature of a partnership, usually limited to some specific undertaking. Berwin v. Cable, 313 Mass. 431, 47 N.E.2d 951; Kasishke v. Baker, 10 Cir., 146 F.2d 113; certiorari denied 325 U.S. 856, 65 S.Ct. 1185, 89 L.Ed. 1976; First Mechanics

Bank v. Com'r, 3 Cir., 91 F.2d 275. A venture is an enterprise, presumably speculative. Joint, means that there is to be sharing. All of the partnership characteristics need not be present, but here there was to be a sharing of profits (the royalties), of losses (Little, the expenses and its time, taxpayer, his time[4]), and of activity. Some of the decisions indicate that there should be a sharing of control. Even that was not altogether absent. Although Little under the agreement had the lion's share of control, taxpayer was consulted.[5] A joint venture is a quasi-fiduciary relationship, Mendelsohn v. Leather Manufacturing Corp., 326 Mass. 226, 93 N.E.2d 537; Aiken Mills v. United States, 4 Cir., 144 F.2d 23, which I think fairly describes the relationship of the parties here, who were working and sharing together, over an extended period, for their common good.

The assignment of the patent pursuant to this arrangement was not a sale, and taxpayer's subsequent receipt of royalties constituted ordinary income. The complaint is dismissed.

### On Motion for New Trial

■ There is a motion for new trial filed on the 10th day after judgment, on the ground "that the plaintiff has newly discovered evidence." The motion does not indicate what this evidence is, nor was it accompanied by anything that did. Everything about Rule 59, 28 U.S. C.A., emphasizes dispatch. In my opin-

Ala. 312, 80 So. 394; Smith v. Graham Refrigeration Products Co., Inc., 333 Mass. 181, 129 N.E.2d 884; Restatement, Contracts, § 258, Illus. 2.

3. Little, asked by taxpayer's counsel to describe it as a purchase, testified,
"I wouldn't use the term 'purchase.' We [undertook] to exploit it at our expense. I don't know just what you mean by 'purchase.'"
Legal conclusions by laymen normally carry little weight, but this one makes an important point. Little's acquisition of the invention was not for its own use, a so-to-speak completed transaction, but

was in order to attempt further transactions—a good definition of a venture.

4. "My time would be lost if the invention was not practicable." Practicable meant merchantable. It was in assisting in an endeavor to show this that taxpayer put in his time.

5. This particularly appears from a writing of January 23, 1941, in which taxpayer recites that he had been kept informed of the various dealings Little had been having with one Badger, and that he approved of them. Taxpayer argues that this was simply an agreement to do consulting work for Badger. I construe its implications much more broadly.

ion where the record does not already contain the matters upon which the moving party relies, they should be filed with the motion, at least in the absence of an extension of time under Rule 6 (b), not here obtained. Cf. Elliott v. United Employers Cas. Co., D.C.S.D. Tex., 35 F.Supp. 781, where the movant set forth in detail what he expected to be able to show and the reasons for its then non-availability, and was permitted to take depositions later. An oral statement by counsel at the hearing is insufficient. Cf. Marshall's U. S. Auto Supply, Inc., v. Cashman, 10 Cir., 111 F.2d 140, certiorari denied 311 U.S. 667, 61 S.Ct. 26, 85 L.Ed. 428. Otherwise the specific provisions in the Rule about affidavits and counter-affidavits and the time for filing same, would seem pointless. However, in this instance, I will regard counsel's neglect as excusable, and accept the late submission of affidavits tendered since the hearing.

The plaintiff has filed two affidavits; one of himself, and one of counsel. Plaintiff's first obligation is to explain why the alleged newly discovered evidence could not have been found by due diligence before trial. Grant County Deposit Bank v. Greene, 6 Cir., 200 F.2d 835; United States v. Bransen, 9 Cir., 142 F.2d 232. Although the alleged newly-discovered documents were admittedly at all times in his personal possession, and any prior search was made, presumably, by him, his own affidavit discloses nothing of value on this subject. The account of plaintiff's alleged prior search is contained, instead, in counsel's affidavit, which on its face in this respect is hearsay. I do not understand the reason for this procedure. There is a substantial burden upon a party seeking a new trial, and a hearsay affidavit under such circumstances is inadequate.[1] Julien v. Barker, 75 Idaho 413, 272 P.2d 718.

I might add, however, that even if the documents annexed to plaintiff's affidavit were duly before me, they could not, as a matter of substance, show sufficient cause for a new trial. There are five offered documents. Taking them chronologically, the memorandum of January 29, 1934, is nothing but written corroboration of a certain portion of plaintiff's oral testimony which was uncontradicted, and which I believed. The memorandum of March 27, 1936, was already in evidence. The memorandum of April 1, 1936 is merely corroboration of Stevenson's (Little's) oral testimony, which I also believed. Indeed, it confirms the fact that the March 27 memorandum was an agreement, as described in the opinion. See, particularly, footnote 2. The letter agreement of June 16, 1936, by its terms is inapplicable to the present situation. The letter of January 23, 1941, was already in evidence. I am not particularly concerned with who dictated it. Finally, the fact that plaintiff's health had not always been good, and that his memory may not have been always good on the stand, has not been shown to have been injurious to his case.

This is not the stuff of which new trials are made. The motion is denied.

---

1. I note also that this affidavit suggests the plaintiff may not even have examined ▮▮▮▮▮ his correspondence file kept on this subject matter.