**Brenda PAYTON et al., Plaintiffs,**

**v.**

**ABBOTT LABS et al., Defendants.**

**Civ. A. No. 76–1514–S.**

United States District Court,
D. Massachusetts.

April 23, 1981.

Jeanne Baker and David J. Fine, Baker & Fine, Cambridge, Mass., for plaintiffs.

Marshall Simonds, Goodwin, Procter & Hoar, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON ISSUES 9 AND 10 CERTIFIED FOR CLASS TREATMENT

SKINNER, District Judge.

In a memorandum and order dated July 30, 1979, I conditionally certified thirteen issues for class resolution. See 83 F.R.D. 382, 386–87. The case is presently before me on defendants' motion for partial summary judgment on class issues 9 and 10. These issues are defined as follows:

9.  whether and when, in producing, marketing, and promoting DES [Diethylstilbestrol] as a miscarriage preventative, the defendants engaged in a joint enterprise;

10. whether and when the defendants combined and conspired in their acts and omissions relating to DES.

See 83 F.R.D. at 386.[1]

## I. *SUMMARY JUDGMENT STANDARD*

Fed.R.Civ.Pro. 56(c) provides that summary judgment shall be rendered

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

This standard requires the party opposing the motion to "establish the existence of an issue of fact which is both 'genuine' and 'material'". *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir. 1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 54 (1976). In determining whether summary judgment is appropriate the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party. *Id.*

## II. *FACTS*

Viewed in the light most favorable to plaintiffs, the affidavits submitted by the parties reveal the following facts.

Estrogen is a female sex hormone present in varying amounts in the body of every woman. This hormone is crucial to female sexual development and fertility.

Natural estrogens were first isolated outside the human body in the 1920's. Doctors initially used the hormone to treat. menopausal symptoms in women. Natural estrogen therapy had several drawbacks, however. The process of isolating the hormone was very costly. Furthermore, natural estrogens could only be administered through injections into the buttocks, often resulting in painful abscesses.

In the late 1930's, a group of British scientists discovered Diethylstilbestrol ("DES"), a synthetic compound which shares some of the characteristics of estrogen. DES could be produced at only a fraction of the cost of isolating natural estrogens and could be administered orally. It was never patented.

Approval of the Food and Drug Administration ("FDA") was required before DES could be marketed in the United States. Pursuant to § 505 of the Federal Food, Drug, and Cosmetic Act, each company wishing to market DES had to file a New Drug Application ("NDA") detailing the

1. In a recent order, I certified several of the class issues to the Massachusetts Supreme Judicial Court pursuant to Rule 3:21 of that Court. Among these is issue 11, which is:

whether, if the defendants did not combine, conspire or engage in a joint enterprise, a defendant may be held liable to a class member who cannot identify the maker of the DES to which she was exposed.

Issue 11 presents to the Supreme Judicial Court the question whether to adopt a nontraditional theory of liability, such as "enterprise liability". See, e. g., *Hall v. E.I. Du Pont De Nemours & Co.,* 345 F.Supp. 353 (E.D.N.Y.1972). Issues 9 and 10, on the other hand, deal with conventional theories of collective liability, and I will therefore address only such theories in considering defendants' motion for partial summary judgment.

proposed uses of the drug, clinical data establishing its safety and efficacy, the drug's chemical composition, methods of manufacturing it and proposed labeling.

The first NDA for DES was filed in 1939. By the end of 1940, ten firms had applied. The NDAs sought authorization to market and distribute DES for four purposes: the treatment of post-menopausal symptoms, senile vaginitis, gonorrheal vaginitis, and suppression of lactation. None of the proposed uses relate to problems of pregnancy.

All indications from the FDA in 1939 suggested that the FDA would review each manufacturer's NDA separately. This meant that each firm had to stand on the clinical data it submitted in its own NDA, and could not rely on other companies' data. Some companies expressed hope that the FDA would change its policy to permit the use of pooled clinical data.[2] Carson Frailey, then Executive Vice President and Secretary of the American Drug Manufacturers Association ("ADMA") decided to monitor the situation for possible changes in FDA policy. In December 1939, several firms held an informal meeting to compare their clinical experience with DES.

In late 1940, Dr. Theodore G. Klumpp, then Chief of the Drug Division of the FDA, communicated to Carson Frailey that the FDA was considering requesting the drug companies to pool their clinical data on DES. Several drug companies objected on the ground that it would be unfair to those firms that had done the most testing and expended the most resources.

The FDA then convened a meeting with the drug companies on December 20, 1940, at which it formally requested that the companies submit their clinical data jointly in a "master file". According to Dr. Klumpp, this decision was taken in the "public interest". The FDA believed that the individual NDAs did not contain sufficient clinical data to properly evaluate the safety and efficacy of DES. Pooling of the data, in the FDA's view, would eliminate this problem as well as expedite its evaluation of DES. The FDA did not have authority to compel the drug companies to submit a "master file". Nevertheless, Dr. Klumpp impressed upon the companies that if the FDA had to consider each manufacturer's NDA separately, the process of approval would be seriously delayed.

On January 21, 1941, the "small committee" was formed, composed of representatives of the firms that had filed NDAs for DES. Its purpose was to coordinate the pooling of clinical data into the "master file".

The FDA made three other requests of the drug companies at this time. The first was that each company use the same United States Pharmacopeia standard to establish the chemical identity of the drug. The second was that they develop uniform labeling regarding the indications for use of the drug and recommended dosage. The third was that they place a provision in their NDAs authorizing the FDA to use the materials gathered by each firm in considering any other NDAs that might be filed.

The companies, for the most part, complied with these additional requests. Each company's DES compound tracked the United States Pharmacopeia standard. Their proposed labeling and warnings for the drug were similar. With respect to the FDA's request for a permissions clause, though several companies did not agree to it, at least six did include such a clause in their NDAs.[3]

The ADMA coordinated all communications between the FDA and the individual drug companies throughout this period. On

---

**2.** The only time prior to the DES filings that the FDA directed drug companies to pool their clinical data was in the case of the NDAs for the drug Sulfathiazole.

**3.** The permissions clause for the six firms read: Permission is hereby granted for any or all firms which have in the past filed or which may in the future file applications for Stilbestrol under Section 505, to include in any new application for Stilbestrol that material submitted under Clause 1 (the report of clinical and safety data clause) of all previous applications of this company regarding Stilbestrol.

behalf of the drug companies, the ADMA also filed the final versions of the 1941 NDAs with the FDA.

In May 1941, the small committee submitted the "master file" of clinical data to the FDA. The FDA approved the marketing of DES for uses unrelated to problems of pregnancy in late 1941. Thereafter, the small committee was disbanded, never again to reconvene. The ADMA continued to file NDAs up through 1943 on behalf of other companies seeking to market DES for the uses previously sanctioned.

Experimental use of DES as a miscarriage preventative began in the early 1940's. Several drug companies supplied DES to independent researchers for such experimentation. The drug companies also sent representatives to medical conferences on this topic.

The first supplemental NDAs for the use of DES as a miscarriage preventative were filed in 1947. Only a few companies conducted their own experiments to establish the safety and efficacy of DES for this purpose. Among these, none tested DES on pregnant laboratory animals. The applicants relied instead upon published studies done by independent researchers to support their applications, in particular, the work of Dr. Karl John Karnaky of Houston and Drs. O. Watkins Smith and George Van S. Smith of Boston. The supplemental NDAs did not refer to the "master file" of clinical data that had been submitted with the 1941 NDAs. The FDA's policy in reviewing supplemental NDAs, however, was to take into consideration all of the material that it had in support of the original NDAs.

The FDA began approving the supplemental NDAs in July 1947. Soon thereafter, DES was marketed as a miscarriage preventative. Some companies marketed the drug under a trade name; others marketed it generically. Several companies supplied DES to competitors. Because the DES compounds produced by the drug companies were chemically identical, pharmacists often filled prescriptions for DES with whatever company's drug was in stock, a practice that the firms were aware of.

None of the companies warned physicians about the possibility of carcinogenic or other risks to the offspring of women who took DES. Several, however, had warned against the use of DES in women having a history of cancer.

The number of firms marketing DES has fluctuated considerably over the years. In 1941, ten firms filed NDAs for DES. By 1947, 71 companies were producing or distributing the drug. In 1957, this had increased to 151 firms. And by 1967, the number of firms marketing DES had dropped back to 91. Additionally, companies have entered and left the DES market at different times.

In 1952, the FDA decided that DES was no longer a "new drug" within the meaning of § 505 of the Food, Drug, and Cosmetic Act. This meant that companies wishing to market DES for the first time would not have to file NDAs.

In 1971, Dr. Arthur Herbst and several other physicians published a study linking the outbreak in young women of clear cell adenocarcinoma, a form of cancer, with the ingestion of DES by their mothers during pregnancy. In November of that same year, the FDA required the drug companies to include a statement on all labels that "DES is contraindicated for use in the prevention of miscarriages." Today, the FDA continues to permit the use of DES in treatments unrelated to problems of pregnancy.

## III. THEORIES OF CONCERT OF ACTION AND JOINT VENTURE

As with most aspects of this case, plaintiffs and defendants have contrasting views on the various theories of concert of action and joint venture recognized under Massachusetts law. Plaintiffs argue that there are five theories under which a defendant in this case may be held liable for the tortious acts of other drug companies. The first three are based on the Restatement of Torts 2d § 876 (hereinafter, "Restatement"), which provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

The fourth theory is the doctrine of joint venture, derived from the law of partnership. The fifth theory is based on the liability of a licensor to persons using or being affected by the thing that is licensed. Defendants, on the other hand, believe that Massachusetts law recognizes only two theories applicable to this case, a restricted version of Restatement § 876 and a joint venture theory.

I rule that there are three theories of liability under Massachusetts law that may bear on the resolution of class issues 9 and 10. These theories are loosely identified as concert of action, aiding and abetting, and joint venture.

## A. CONCERT OF ACTION

■ The concert of action theory in Massachusetts tracks § 876(a) of the Restatement. This theory holds a defendant liable for harm resulting from the tortious acts of another when two elements are established. The first is that the defendant and the other have an agreement to perform the act or achieve the particular result. *Gurney v. Tenney,* 197 Mass. 457, 466, 84 N.E. 428 (1908). The plaintiff need not prove the existence of an agreement by direct evidence. *Nelson v. Nason,* 343 Mass. 220, 222, 177 N.E.2d 887 (1961). Rather, an agreement can be inferred from conduct of the parties suggesting that they had an implied meeting of minds. *Orszulak v. Bujnevicie,* 355 Mass. 157, 158–59, 243 N.E.2d 897 (1969); W. Prosser, *Law of Torts* 292 (West 1971); Comment on Clause (a), Restatement § 876. The second element of the theory is

that the defendant's own conduct must be tortious. *Gurney v. Tenney,* 197 Mass. at 466, 84 N.E. 428. This does not mean that the defendant's conduct must cause or be a substantial factor in causing the plaintiff's injury. Rather, this element requires only that defendant have acted negligently or in an intentionally tortious manner. *See* Comment on Clause (a), Restatement § 876.

## B. AIDING AND ABETTING

■ As with concert of action, the theory of aiding and abetting under Massachusetts law follows the Restatement § 876(b). Two elements comprise this theory. The first is that the defendant must give substantial assistance or encouragement to the other party. *Brown v. Perkins,* 83 Mass. (1 Allen) 89, 97–98 (1861). In determining whether this element is satisfied, "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind are all considered." Comment on Clause (b), Restatement § 876. Unlike the concert of action theory, there need be no agreement between the parties for this theory to apply. *Brown v. Perkins,* 83 Mass. (1 Allen) at 97. The second element is that defendant must have an unlawful intent, *i. e.,* knowledge that the other party is breaching a duty and the intent to assist that party's actions. *Id.* at 98. *See McGrath v. Sullivan,* 303 Mass. 327, 22 N.E.2d 192 (1939); *The American Agricultural Chemical Co. v. Robertson,* 273 Mass. 66, 172 N.E. 871 (1930).

## C. JOINT VENTURE

■ The joint venture theory is one of the most fluid concepts in all of the law. The Supreme Judicial Court of Massachusetts has put it this way:

Although this court on several occasions has discussed joint adventures, it has never attempted a comprehensive definition of that relationship.... We do not now attempt such a definition. Speaking generally a joint adventure is a partnership of a sort or, at least, it has many of its characteristics. It differs,

however, from a partnership in that it is ordinarily, although not necessarily, limited to a single enterprise. *Cardullo v. Landau,* 329 Mass. 5, 8, 105 N.E.2d 843 (1952).

It has been suggested that the refusal of courts to develop a hard-and-fast definition of the joint venture concept is "attributable to the effort to do equity in a variety of situations." Crane & Bromberg, *Law of Partnership* 190 (West 1968).

Important elements of the joint venture theory have nevertheless been discussed in the case law. The starting point of any joint venture is an agreement among the parties to associate themselves in a business activity. *Cardullo v. Landau,* 329 Mass. at 8, 105 N.E.2d 843. A second element is that the parties must share in the profits and losses of the venture. *Air Technology Corp. v. General Electric Co.,* 347 Mass. 613, 625, 199 N.E.2d 538 (1964); *Kleinschmidt v. United States,* 146 F.Supp. 253, 256 (D.Mass.1956). Joint control of the objectives of the undertaking and of the means of achieving those objectives is another element. *Air Technology Corp. v. General Electric Corp.,* 347 Mass. at 625, 199 N.E.2d 538. This does not mean, however, that the parties must have an equal right of control. *Kleinschmidt,* 146 F.Supp. at 256. All that

is required is that every party have some degree of input into the operation of the venture. Crane & Bromberg, *Law of Partnership* 191. A fourth element of this theory is that the parties must make a contribution to the assets of the venture, *see Cardullo v. Landau,* 329 Mass. at 9, 105 N.E.2d 843, and that these assets be held jointly by the parties. *Air Technology Corp.,* 347 Mass. at 625, 199 N.E.2d 538.

The absence of any one of these elements may not be fatal to establishing the existence of a joint venture. *Cardullo,* 329 Mass. at 9, 105 N.E.2d 843; *Kleinschmidt,* 146 F.Supp. at 256. Nevertheless, it has often been stated that profit sharing and joint control are the *sine qua non* of the joint venture. See Crane & Bromberg, *Law of Partnership* 66.

The existence of a joint venture relationship imposes numerous duties and obligations on those who are parties to it. *See, e. g., Warsofsky v. Sherman,* 326 Mass. 290, 93 N.E.2d 612 (1950) (joint venturers owe a fiduciary obligation to one another). For purposes of this case, the principal legal consequence of the joint venture theory is that each member of the enterprise is liable for any accidents caused in the carrying out of that enterprise. *Loftus v. Pelletier,* 223 Mass. 63, 65, 111 N.E. 712 (1916).[4]

---

**4.** I have rejected two other theories that plaintiffs argue are applicable here, one based on Restatement § 876(c) and the other based on the liability of a licensor. Plaintiffs first contend that Restatement § 876(c) embodies the joint and several liability doctrine, which states that where two independent tortfeasors concurrently cause an indivisible injury, they are both individually liable for the full amount of the plaintiff's damages, with a right of contribution and indemnity against each other. Two points should be made. The first is that Restatement § 876(c) does not actually deal with this concept. Instead, it concerns yet another variant of collective liability that has apparently not been adopted in Massachusetts. See Comment on Clause (c), Restatement § 876. Secondly, the joint and several liability doctrine does not fall within class issues 9 and 10. As Prosser has suggested, this doctrine should not be confused with principles of vicarious or collective liability. Prosser, *Law of Torts* 297–98. It is more a rule of damages than of liability; the doctrine comes into effect only after a plaintiff

can prove all of the elements of the tort against every defendant.

Plaintiffs also contend that principles of licensor liability are relevant here. They point out that several defendants included permissions clauses in their 1941 NDAs that allowed other companies to take advantage of clinical data owned by the defendants. These clauses, in plaintiffs' view, created a license arrangement and, therefore, expose defendants to liability for any injuries tortiously caused by the thing licensed. Plaintiffs cite in support of this theory several cases dealing with the duties of a possessor of real property to a licensee, *i. e.,* one who comes on to the premises by permission only, without any enticement or allurement. *Mounsey v. Ellard,* 363 Mass. 693, 297 N.E.2d 43, 45 (Mass.1973). Even if such a theory as plaintiffs propose exists under Massachusetts law, and I take no present view on the matter, it is not encompassed by class issues 9 and 10. Quite simply, the cases plaintiffs have cited deal with whether a duty of care is owed by one party to another. Thus, the real property cases hold that one in posses-

## IV. APPLICATION OF THE THEORIES

In order to survive defendants' motion for partial summary judgment, plaintiffs must establish the existence of a genuine and material issue of fact under any of these theories.

### A. CONCERT OF ACTION

Plaintiffs argue that the drug companies that marketed DES tortiously agreed not to test the drug properly to determine its safety and efficacy as a miscarriage preventative and not to warn of the carcinogenic danger which DES posed to the fetus. For purposes of this motion, it will be assumed that the individual drug companies acted tortiously.[5] The only issue, then, is whether plaintiffs have met the burden of presenting evidence creating a genuine issue of fact as to whether such an agreement between the defendants existed.

Plaintiffs acknowledge that there is no direct evidence of an agreement not to test DES properly or warn of its carcinogenic effects. They assert, however, that such an agreement can be inferred from the consciously parallel behavior of the drug companies,[6] in particular, the fact that all the companies failed to test DES on pregnant laboratory animals, that all failed to warn of the carcinogenic danger which DES posed to the fetus, and that all marketed the drug in spite of compelling evidence that it was not effective to prevent miscarriages. Parallel conduct by itself cannot prove agreement, as plaintiffs admit. They argue, however, that there are other factors in this case which, taken in conjunction with the parallel behavior, give rise to a reasonable inference that the companies had an agreement. Among the six factors listed by plaintiffs, only two deserve attention: evidence of actual collaboration among the companies regarding DES in 1939–1941, and evidence of the opportunity to collaborate.[7]

Plaintiffs argue that the defendants' collaborative activity regarding DES in 1939–1941 raises a strong inference that such collaboration continued into the future, and included an agreement about testing and warnings. Such an inference, however, does not flow naturally from the facts established in the record. The 1941 collaboration was confined to the activities of the "small committee", the sole purpose of which was to collect and organize clinical data that had already been accumulated by the individual drug companies filing NDAs. The scope of this collaboration was extremely limited. The committee did not decide what type of testing was to be per-

---

sion of land owes a duty of reasonable care to all lawful visitors. *Mounsey v. Ellard*, 363 Mass. 693, 297 N.E.2d at 51. No question of vicarious or collective liability is presented in these cases, and, therefore, plaintiffs' proposed theory is not properly before me.

**5.** Issue 5 certified for class treatment is:
whether and when the defendants were negligent in manufacturing and marketing DES for use by pregnant women to prevent miscarriages.
83 F.R.D. at 386.
Issues 6 and 7 concern whether defendants can be held strictly liable or absolutely liable to plaintiffs under Massachusetts law. *Id.* In arguing the present motion for partial summary judgment, the parties have not focused on the question of defendants' tortious conduct, emphasizing instead whether there was collective activity. This is proper, in my view, because the question of tortious conduct is best addressed under class issues 5, 6 and 7.

**6.** The doctrine of conscious parallelism is most commonly invoked in federal antitrust cases.

See *Interstate Circuit v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). There are no Massachusetts cases explicitly incorporating the doctrine, but in view of its relevance to the issues presented in concert of action cases I am willing to entertain plaintiffs' argument.

**7.** The four other factors are (1) the extraordinary nature of defendants' parallel conduct (2) success of the conduct depended on unanimity; (3) the existence of a logical motive for entering into the tacit agreement; and (4) the evasiveness of defendants' responses to discovery. In my view, the first three factors are relevant, if at all, only where the defendants have engaged in positive acts. Here, plaintiffs are accusing defendants of a failure to act. There is a clear distinction between the two. I am reluctant to infer agreement from nonaction absent strong circumstantial evidence of the existence of such an agreement. The fourth factor is, in my opinion, irrelevant.

formed; it did not regulate the volume of testing; indeed, it had no impact whatsoever on the scientific content of the clinical data submitted to the FDA. The small committee's role was merely clerical. It was created at the FDA's request and disbanded shortly after the FDA approved DES in 1941 for uses unrelated to problems of pregnancy. I do not see how a broad-scaled agreement not to test properly or warn can reasonably be inferred from such a limited cooperative effort.

Even if the 1941 collaboration had been broader in scope, it would still be difficult to make a connection between the 1941 and 1947 applications. The reason is that the uses of DES proposed in the 1941 NDAs are unrelated to problems of pregnancy and continue to be recognized by the FDA as safe and proper. The clinical data submitted with the 1941 NDAs was directed at these uses. Therefore, any cooperation regarding this data, however broad, bears no evident relationship to the use of DES at issue here. It is true that the 1947 NDAs are deemed "supplemental" to the 1941 NDAs and the FDA may have considered clinical data submitted in 1941 in passing on the 1947 applications. The drug companies, however, relied on new scientific studies to support their 1947 applications and none of those applications referred to the clinical data submitted in 1941. Any connection between the 1941 and 1947 application is thus extremely remote. *See Lyons v. Premo Pharmaceutical Labs, Inc.*, 170 N.J.Super. 183, 406 A.2d 185, 190–91 (1979).

Another factor that plaintiffs rely on to establish an inference of agreement is that the drug companies had ample opportunity to collaborate and plan such an agreement. In particular, plaintiffs point to three facts, the existence of pharmaceutical trade associations (the ADMA and its successors), the practice of drug companies sending representatives to scientific conferences, and the fact that some of the defendants sold DES to competitors, as evidence that the drug companies were often in contact with one another over DES.

These facts do not, however, support an inference of agreement. There is nothing inherently wrong with membership in an industry-wide trade association, with participating in scientific conferences, or with selling products to a competitor in an arms-length transaction. Indeed, these practices are probably common to most industries. As the Supreme Court of California recently stated in *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, 933 (Cal.1980), a case involving the same use of DES at issue here:

> Application of the concept of concert of action to this situation would expand the doctrine far beyond its intended scope and would render virtually any manufacturer liable for the defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by the defendant.

Plaintiffs are unable to demonstrate any activity concerning the 1947 NDAs indicative of an agreement between the defendants. The record shows that the drug companies acted independently in collecting clinical data for the 1947 NDAs. Though there is some overlap in the studies upon which they relied, this is hardly remarkable given the small number of acknowledged experts doing research in this area. Furthermore, the limited cooperation that took place in 1941 was not even repeated in 1947. The drug companies did not form a small committee in 1947 to pool clinical data; nor did the ADMA coordinate communications between the FDA and the companies.

In short, there is no evidence that the defendants agreed not to test DES properly for its use as a miscarriage preventative or not to warn of its carcinogenic dangers. Plaintiffs have therefore failed to meet their burden of establishing an issue of fact under the concert of action theory.

**B.  *AIDING AND ABETTING***

Plaintiffs argue that the drug companies gave substantial assistance and encouragement to each other in marketing DES for use as a miscarriage preventative and,

therefore, that they are collectively liable for any injuries resulting from such use. In plaintiffs view, the following undisputed facts raise a genuine issue as to whether the defendants substantially assisted and encouraged one another: (1) the DES marketed by all drug companies was chemically identical; (2) physicians frequently prescribed DES generically; and (3) pharmacists often filled such prescriptions with whatever drug company's DES they happened to have in stock.

In my opinion, these facts do not even remotely suggest that the drug companies aided and abetted each other in marketing DES. The chemical identity of each company's DES compound was established at the request of the FDA pursuant to the United States Pharmacopeia standard. Plaintiffs have failed to demonstrate how the drug companies may have assisted each other in complying with this standard. As to the practices of physicians and pharmacists in prescribing and filling orders for DES, they have no bearing whatsoever on defendants' activities. That defendants may have known about these practices does not implicate them in an "aiding and abetting" scheme.

Nor are there any other facts in the record demonstrating that the defendants engaged in mutual assistance to market DES. Indeed, the evidence shows that the various firms had independent distribution channels and advertising practices. I rule, therefore, that plaintiffs have failed to meet their burden under Fed.R.Civ.Pro. 56(c) of establishing a genuine issue of material fact under this theory.

### C. JOINT VENTURE

Plaintiffs argue that the marketing of DES had all the characteristics of a joint venture. They reason that the generic aspects of the DES market created a community of pecuniary interest among the companies, to which all contributed and from which all received benefit. This, in addition to the firms' cooperative efforts in 1941, raises an issue of fact as to the existence of a joint venture, in their view.

As previously noted, the joint venture theory is a fluid concept and the absence of any one of the "traditional" elements is not necessarily fatal to a plaintiff's case. Here, however, plaintiffs have failed to produce evidence raising an issue of fact as to any of the elements.

The marketing of DES has none of the characteristics of a joint venture. Hundreds of firms marketed or distributed the drug at different times over a thirty year period; some remained in the market for many years, others exited quickly. These characteristics of the DES market, taken alone, refute any argument that the firms had a cooperative arrangement to market the drug. Beyond this, however, plaintiffs have failed to produce any evidence that the firms shared profits or exercised joint control over the means and objectives of marketing the product. The record reveals instead that the companies made independent decisions regarding distribution, advertising and participation in the market; no firm exercised control or veto power over another. Nor is there any evidence that the companies contributed assets to a joint venture or that there were assets held in common.

I rule, therefore, that plaintiffs have failed to produce any evidence demonstrating a genuine dispute of fact under the joint venture theory.

### V. CONCLUSION

Under traditional principles of tort law, in all but a few circumstances a plaintiff may recover damages from a defendant only where it is established that the defendant caused the injury. The theories of concert of action and joint venture provide an exception to this rule. Had they been applicable to this case, these theories would have allowed plaintiffs to surmount their problem of identifying the manufacturer of the DES taken by each plaintiff's mother.

I am firmly convinced, however, that none of these theories are properly invoked here. To hold otherwise would stretch them well beyond their intended scope. I

am mindful that plaintiffs' identification problem is the product of factors beyond their control, including the passage of time and the marketing practices of the drug industry. Other courts have recognized this and discovered novel legal theories to afford similarly-situated plaintiffs an avenue of relief. *See, e. g., Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (Cal.1980). In the exercise of diversity jurisdiction, however, I should refrain from such an approach. The response of Massachusetts jurisprudence to these new challenges is properly the province of the Supreme Judicial Court, not a federal district court. In a recent order, I certified several questions to that Court, through which it will have the opportunity to address these issues.[8]

Accordingly, defendants' motion for partial summary judgment as to class issues 9 and 10 is ALLOWED.