952 F.Supp. 884 (1997)
MASSACHUSETTS SCHOOL OF LAW AT ANDOVER, INC., Plaintiffs,
v.
AMERICAN BAR ASSOCIATION (An Unincorporated Association Existing Until December 7, 1992), American Bar Association (An Incorporated Trade Association Existing Since December 7, 1992), The Association of American Law Schools, New England School of Law, James P. White, Steven Smith, Peter Winograd, Richardson W. Nahstoll, Rennard Strickland, Jose Garcia-Pedrosa, John E. Ryan, Claude R. Sowle, Frank K. Walwer, Pauline A. Schneider, Eric A. Moeser, Rudolph C. Hasl, Henry Ransey, Jr. and Diane Yu, Defendants.
C.A. No. 95-12321-MEL.
United States District Court, D. Massachusetts.
January 10, 1997.
*885 *886 Michael L. Coyne, Andover, MA, Peter M. Malaguti, Massachusetts School of Law at Andover, Inc., Andover, MA, for Plaintiff Massachusetts School of Law at Andover, Inc.
James R. DeGiacomo, Cynthia H.N. Post, Roche, Carens & DeGiacomo, P.C., Boston, MA, for defendant New England School of Law.
LASKER, District Judge.
The Massachusetts School of Law at Andover, Inc., (MSL) sues the American Bar Association, the Association of American Law Schools, the New England School of Law and several individual defendants alleging that the defendants unfairly denied accreditation to MSL, "intentionally attempted" to damage MSL's reputation and to launch a campaign to petition the SJC to allow only graduates from ABA-approved law schools to sit for the Massachusetts bar examination, thereby preventing MSL graduates from taking the bar and from practicing law in Massachusetts.[1]
MSL's Complaint alleges two causes of action against NESL: (1) tortious misrepresentation and (2) various violations of Mass. Gen.L. c. 93A, including unfair and deceptive trade practices, unfair methods of competition, and conspiracy. Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, NESL moves to dismiss the Complaint as to it.
The motion is granted.

I.
MSL was founded in 1988 and is located in Andover, Massachusetts. According to MSL, the law school seeks to provide "high quality education to students, sometimes by very conventional means and sometimes by innovative means" and to furnish "education and associated economic and social mobility to persons ... who largely have been excluded from law schools." Complaint ¶ 21. To this end, MSL attempts to make law school more affordable by requiring, among other things, professors "to work year round [and] engage in administrative work" and by making "extensive use of expert adjunct professors." Complaint ¶ 22.
In May 1990, MSL was licensed by the Massachusetts Board of Regents to award the degree of Juris Doctor. Licensure also enabled MSL's students to sit for the Massachusetts bar examination and to practice law in Massachusetts. After MSL received state approval, it applied for ABA accreditation. MSL submitted its accreditation application to the ABA in October 1992 and was inspected by an ABA site inspection team in March 1993. MSL was denied accreditation shortly thereafter.
MSL's claims against NESL are based on four letters exchanged between representatives of NESL, James Lawton, Chairman of the NESL Board of Trustees, and Ellen Wayne, NESL's then Director of Placement and Career Services, and James White, Consultant on Legal Education to the American Bar Association. In the first letter, Chairman Lawton wrote White correctly informing him that MSL had been certified by the Massachusetts Board of Regents, but incorrectly stating that MSL was politically connected to former Senator Tsongas. In the second letter, from Wayne to White, Wayne told White about actions taken at the Northeast Association of Prelaw Advisors to exclude non-ABA accredited law schools, such as MSL, from the Northeast Associations' Law School Fair. In the third letter, White wrote Chairman Lawton asking his opinion as to whether NESL and other Massachusetts ABA-accredited law schools would be interested in petitioning the Supreme Judicial Court to require graduation from an *887 ABA-approved law school as a condition for taking the Massachusetts bar examination. The fourth letter is Chairman Lawton's response to White's inquiry.
The letters are discussed in some detail below; the text of the letters are in the attached Appendix.

II.
As stated above, MSL states two causes of action against NESL: various violations of Mass.Gen.L. c. 93A, including unfair and deceptive trade practices, unfair methods of competition, and conspiracy, and independently, tortious misrepresentation. MSL alleges that NESL violated c. 93A § 11 by "intentionally attempt[ing] through defendant White [and with the other defendants] to harm MSL's reputation and cause it severe economic harm by launching a campaign to prevent MSL graduates from taking the Massachusetts bar examination" and by "unfairly conspir[ing] with [the other defendants] to drive MSL from the legal education market." Complaint ¶ 68. In addition, MSL alleges that NESL committed the torts of business defamation and injurious falsehood by its "miscasting of MSL as a politically connected but incompetent law school" in the letters exchanged between NESL and the ABA. Complaint ¶ 79.[2]
NESL moves to dismiss on several grounds. First, with regard to c. 93A, NESL contends that: as an educational institution, it does not engage in "trade or commerce" within the meaning of the statute and therefore c. 93A is not applicable to it, and that even if c. 93A is applicable, the exchange of letters did not amount to "unfair or deceptive conduct" as defined by the statute. Second, with regard to MSL's business defamation and injurious falsehood claims, NESL contends that the letters are not defamatory, that they constitute non-actionable expressions of opinion, and that NESL's representatives held a conditional privilege to enter into such correspondence with the ABA.
MSL responds that NESL and MSL are involved in "trade or commerce" as defined by c. 93A because "the purpose of its critical letters about MSL was to advance NESL's interest in obtaining tuition revenues by injuring MSL's ability to recruit students, and thereby to obtain competitive advantage over MSL" and that such conduct is actionable under c. 93A. MSL further responds that it has alleged sufficient facts to state claims under c. 93A for unfair and deceptive conduct including business defamation and injurious falsehood and conspiracy and unfair methods of competition.
Although MSL asserts separate claims for tortious misrepresentation and "unfair and deceptive acts" under c. 93A, since both claims are based solely on the exchange of the four letters between NESL and ABA, the test as to the sufficiency of both claims is whether the letters singly or collectively constituted defamatory material injurious to MSL. Indeed, as the Supreme Judicial Court has recently stated with regard to a c. 93A claim for an unfair or deceptive act "where allegedly defamatory statements do not support a cause of action for defamation, they also do not support a cause of action under M.G.L. c. 93A." Dulgarian v. Stone, 420 Mass. 843, 852, 652 N.E.2d 603 (1995). The starting place for such a determination is an examination of the text and context of the letters.

III.

The Letter of January 2, 1990, from Chairman Lawton to James White
As noted above, the first letter is the only one that is alleged to have contained any false statements concerning MSL. Dated January 2, 1990, it was written by James R. Lawton, the Chairman of NESL's Board of Trustees, to White and stated in pertinent part:
The Chairman of the Massachusetts Board of Regents is former U.S. Senator Paul Tsongas and he is for all intents and purposes the "principal" in the Massachusetts *888 School of Law at Andover. Mr. Tsongas has the solid support of the Boston Globe and the Board of Regents are under his complete control at this time.
My guess is that any other, new or competing law schools, which may come into existence will not receive support from the Regents who are a rigidly controlled group of Dukakis loyalists who will only do what they are told by the present administration under Tsongas and Dukakis.
NESL does not dispute that Tsongas in fact never was a "principal" to MSL, nor that he never had any connection with the school. (According to MSL, Tsongas was in fact a member of the board of trustees of a competing, but now defunct, law school. See Complaint ¶ 53). MSL alleges, however, that the letter was "intended to harm MSL's reputation" and to mislead the ABA into believing that MSL "only received licensure because it had political connections, not because it offered high quality legal education." Complaint ¶ 53.
NESL argues that the misstatement about Tsongas was not defamatory because "presumably having a former Senator as a `principal' would have given the school more, not less, prestige in the eyes of the accreditation team." Moreover, NESL contends that the incorrect statement made by Chairman Lawton was incapable of holding the school up to ridicule or contempt.
Business defamation is committed when a false and defamatory statement is communicated which "prejudice[s] [the plaintiff] in the conduct of its business and deter[s] others [ ] from dealing with it." A.F.M. Corp. v. Corporate Aircraft Management, 626 F.Supp. 1533 (D.Mass.1985). In all other respects, the elements of a business defamation claim are those of ordinary defamation, that is, that the defendant published "a false and defamatory written communication of and concerning the plaintiff." McAvoy v. Shufrin, 401 Mass. 593, 597, 518 N.E.2d 513 (1987).
The first question is "whether the statement is reasonably susceptible of a defamatory meaning, and that determination is a question of law for the court." Foley v. Lowell Sun Pub. Co., 404 Mass. 9, 11, 533 N.E.2d 196 (1989). "The test is, whether, in the circumstances, the writing discredits the plaintiff in the minds of any considerable and respectable class of the community." Smith v. Suburban Restaurants, Inc., 374 Mass. 528, 529, 373 N.E.2d 215 (1978) (citations omitted). If a statement "is susceptible of both defamatory and harmless meanings, it presents a question for the trier of fact." Id. at 530, 373 N.E.2d 215.
The January 2, 1990 letter is not susceptible of a defamatory meaning. To begin, the focus of the letter is Senator Tsongas rather than MSL. Though it states that Tsongas is a principal of MSL and that MSL has the political support of Tsongas and the Board of Regents, suggesting that an institution is politically well-connected is not on its face defamatory. Contrary to MSL's assertions, nowhere in the letter, does Chairman Lawton suggest nor can it be inferred that the only reason MSL was certified was because of its connection to former Senator Tsongas.
Although MSL apparently considers the contents of the letter offensive, no objective reader could conclude that its statements were adverse to MSL, much less that the letter injured it. The letter in no way criticizes MSL or states or implies that its program is inadequate. Indeed, it makes no comment whatsoever as to the standards of an MSL education, nor does it suggest that there was any reason why the Board of Regents of Higher Education should not have accredited MSL. In sum, it nether defames nor injures the plaintiff.
For the same reasons, the letter does not constitute an injurious falsehood. An injurious falsehood is committed by one "who publishes a false statement harmful to the interests of another [with] ... pecuniary loss resulting" if the publisher intended that publication would "result in harm to the interests of the other having pecuniary value" and "he knows that the statement is false or acts in reckless disregard of its truth or falsity." Dulgarian v. Stone, 420 Mass. 843, 852, 652 N.E.2d 603 (1995) (quoting, Restatement Second of Torts § 623A (1977)). MSL does not state a claim for injurious falsehood because *889 the incorrect statements in the letter were not harmful to MSL's interests.

The Letter of June 19, 1990 from Ellen Wayne to James White
The second letter was written by NESL's then Director of Placement and Career Services, Ellen Wayne, to Dean White. It informs White that: MSL had been certified by the Massachusetts Board of Regents; that such certification enabled its graduates to take the Massachusetts bar examination; that the MSL dean and his admissions director came to the "Law School Fair of the Northeast Association of Prelaw Advisors (NAPLA)"; and that the NAPLA Board was obliged to admit MSL to the fair because the bylaws allowed access to all law schools regardless of whether they were ABA-accredited. Wayne also reports that the NAPLA Board thereafter amended the bylaws to provide that access would be available only to "an ABA approved law school."
MSL alleges that the actions described in the letter were "intentionally aimed at harming MSL's reputation and injuring its ability to recruit students." Complaint ¶ 54. However, nowhere in the Complaint or even its memorandum in opposition to this motion does MSL specify that anything reported by Wayne was false. Thus, the letter is nothing more than a truthful recitation of the events at the Law School Fair. See Dulgarian v. Stone, 420 Mass. 843, 847, 652 N.E.2d 603 (1995) ("plaintiff must prove not only that statements were defamatory but also that they were false") (citation omitted).
Although the reference in the letter to the NAPLA Board's action of amending its bylaws to deny access to NAPLA fairs for law schools not approved by the ABA may be viewed as unfavorable and even hostile to MSL, the mere truthful statement that the bylaw was passed is not actionable as defamation or injurious falsehood. Rust v. Tufts University, 1994 WL 902984 (Mass.Super.1994) ("defamation claim fails ... as truth is an absolute defense to such a claim") (citing, Nolan and Sartorio, Tort Law, 2nd Ed. Mass. Practice, Volume 37, pp. 171-72 (1989)).

The Letters of June 27, 1990 and July 17, 1990 Exchanged between James White and Chairman Lawton.
MSL does not allege that the third and fourth letters exchanged between NESL and the ABA contain any false statements. Rather, MSL asserts that these letters are actionable because they were written to "encourage pursuit of a course of action intended to destroy MSL .... [and to] destroy competition from MSL." Complaint ¶ 56-57.
In the third letter, Dean White wrote to Chairman Lawton solely to inquire:
... What do you think the possibility would be for the ABA approved Massachusetts law schools to petition the Massachusetts Supreme Judicial Court to amend its rules to require graduation from an ABA approved law school as a requirement for sitting for the Massachusetts bar examination? I would be grateful for your thoughts on the matter.
Aside from the fact that this question does not even refer to MSL, one is at a loss to understand how this statement can be regarded as defamation or injurious falsehood. The letter contains nothing more than an invitation from Dean White to Chairman Lawton to express an opinion. Lawton's response (the fourth letter) does just that: he states that he "agrees wholeheartedly" that the SJC should be petitioned, but declines to undertake the task, explaining that "[he] personally do[es] not believe that the major law schools in Boston are going to undertake" the task "... because of what [he] perceived as their lack of concern about the creation of new and unaccredited law schools," and that it was "[his] opinion that those individuals who have had close ties with the American Bar Association on the national level should be recruited" for such an effort.
While "statements of fact may expose their authors or publishers to liability for defamations, [ ] statements of pure opinion cannot." King v. Globe Newspaper Co., 400 Mass. 705, 708, 512 N.E.2d 241 (1987); Dulgarian v. Stone, 1994 WL 879631 (Mass.Super.1994) (extending "same protection ... to opinions in actions for injurious falsehood"). Moreover, here the topic upon which White requested an opinion was not even about *890 MSL, but rather about a general issue of legal education. No doubt, this was a subject of considerable concern to MSL; however, even if the exchange of these letters were interpreted as adverse to or inimical to the interests of MSL, the expression of such views is not actionable.

IV.
NESL argues that MSL's c. 93A § 11[3] claim should be dismissed because MSL and NESL are not-for-profit educational institutions engaged in providing legal education to students and therefore are not engaged in "trade" or "commerce" as those terms are defined in c. 93A. Although NESL raises an interesting and unsettled question of state law,[4] it would be inappropriate for a federal court to decide this matter of state law when the case before it can be decided on other grounds.

Unfair and Deceptive Acts under c. 93A
Assuming that NESL was involved in "trade or commerce," MSL's allegations against NESL do not constitute "unfair or deceptive acts" within the meaning of c. 93A. c. 93A claimant must show that the defendant's actions fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness." Quaker State Oil Refining Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir.1989) (citations omitted). MSL alleges that NESL committed business defamation and injurious falsehood and thus is liable under c. 93A.
However, since we have earlier concluded that NESL has not committed any tortious misrepresentation as to MSL, including business defamation or injurious falsehood, NESL's conduct does not, under the authority of Dulgarian v. Stone, 420 Mass. 843, 852, 652 N.E.2d 603 (1995), constitute "unfair or deceptive conduct" under c. 93A.

Unfair Methods of Competition under c. 93A
MSL also claims that NESL's letters constitute "unfair methods of competition," a separate cause of action under c. 93A. Specifically, MSL claims that NESL engaged in unfair competition by implying through Lawton's statement regarding Tsongas that "MSL was controlled by a politician who would grease the path for it." (Opp. Brief at 14).
Unfair competition is "a cause of action by a business usually against a competitor based on conduct giving rise to an anticompetitive effect." Gilleran, § 4:9, at 110 (1989). An anticompetitive effect is
not just injury to a single consumer or other business caused by isolated conduct, but is injury to the marketplace caused by a pattern of conduct. Injury to the marketplace consists of a pattern of conduct, which by preventing consumers from making an informed market decision, impairs the ability of a competitor to compete fairly. *891 Gilleran, § 4:9, at 111 (1989) (citations omitted).
To date, there is a dearth of Massachusetts caselaw as to c. 93A claims based on allegations of unfair competition. See Crosspoint Assoc., Inc. v. Papas, 1994 WL 878943, *3 (Mass.Super.1994) ("there are few Massachusetts cases governing unfair methods of competition"). Nevertheless, c. 93A prohibits unfair methods of competition including disparaging the services or business of a competitor by a false or misleading representation of facts. See Gilleran § 4:8 at 110 (1989). However, as already stated, the SJC held in Dulgarian v. Stone that if allegedly defamatory statements do not support a cause of action for defamation, they also do not support a cause of action under c. 93A, and it has been concluded above that none of the four letters is defamatory.
Chapter 93A also prohibits unfair methods of competition such as causing confusion or misunderstanding as to the sponsorship, endorsement or affiliation of services, or representing that goods or services have a sponsorship, approval, status, affiliation, or connections which they in fact lack. See, e.g., Mobil Oil Corp. v. Auto-Brite Car Wash, Inc., 615 F.Supp. 628 (D.Mass.1984) (c. 93A claim alleging that defendant sold non-Mobil gasoline under the Mobil trademark). However, MSL fails to plead facts sufficient to support a claim under any of these prohibitions.
First, MSL does not even allege that Lawton's statement about Tsongas caused "confusion or misunderstanding" about MSL's sponsorship. However, even if it can be assumed that Lawton's misstatement created an impression in the reader's mind that MSL was politically connected to Tsongas, MSL pleads no facts to support a finding that such misstatement had any anticompetitive effect. Yet, as already noted, unfair competition within the meaning of c. 93A requires a showing of more than "injury to a single consumer or other business caused by isolated conduct," that is "injury to the marketplace caused by a pattern of conduct." Gilleran, § 4:9, at 111 (1989) (citations omitted). MSL's allegations do not meet this test.

Civil Conspiracy under c. 93A
MSL next alleges that "the defendants [including NESL] have unfairly and deceptively conspired with each other to drive MSL from the legal education market" and that NESL is therefore responsible for the tortious acts of the other defendants. Complaint ¶ 68 at 36. "Civil conspiracy is a very limited cause of action in Massachusetts." Jurgens v. Abraham, 616 F.Supp. 1381, 1386 (D.Mass.1985). To state a claim for this tort, a plaintiff must allege that "defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if acting independently." Id. MSL's Complaint nowhere alleges that NESL either alone or in concert with the other defendants, held a "power of coercion" they would not have had had they acted independently. Moreover, although Massachusetts law recognizes the tort theory of "common design" in which a defendant may be liable for the tortious acts of another, to prove such a claim, two elements must be shown: first, that the defendant and others have agreed explicitly or implicitly to perform the act or achieve the particular result; second, that the defendant's "own conduct must be tortious." Payton v. Abbott Labs, 512 F.Supp. 1031, 1035 (D.Mass.1981). Here, MSL's allegations as to the contact between NESL and the other defendants are limited to the exchange of the four letters between NESL and the ABA in 1990. While these letters establish that both NESL and the ABA were interested in monitoring the progress of MSL, there is no implication from the letters that they agreed to perform or achieve any tortious end with respect to MSL. Indeed, NESL's Chairman Lawton declined even to lead the lawful effort of petitioning the SJC to prohibit graduates of state-certified law schools such as MSL to sit for the Massachusetts bar exam. Moreover, since NESL did not commit any tortious misrepresentation as to MSL, its statements could not be the basis of a conspiracy claim.

* * *
Finally, it should be noted that NESL raises other grounds in arguing its motion to dismiss: first, that the c. 93A claim should be dismissed because the actions at issue did not *892 "occur primarily and substantially" within Massachusetts as required by the statute; and second, that the c. 93A and tortious misrepresentation claims are barred by their respective statutes of limitation. However, because these arguments appear to raise fact questions, and, more importantly, because the Complaint must be dismissed on other grounds, no determination is made as to these defenses.
NESL's motion is granted and the Complaint is dismissed as to it.

APPENDIX

The First Letter
The first letter, dated January 2, 1990 was written by, James R. Lawton, the Chairman of NESL's Board of Trustees, to White and stated:
I enclose for your information a recent article from Lawyer's Weekly here in Massachusetts concerning the licensing of the "Massachusetts Law School" at Andover by the Board of Regents of Higher Education.
The Chairman of the Massachusetts Board of Regents is former U.S. Senator Paul Tsongas and he is for all intents and purposes the "principal" in the Massachusetts School of Law at Andover. Mr. Tsongas has the solid support of the Boston Globe and the Board of Regents are under his complete control at this time.
My guess is that any other, new or competing law schools, which may come into existence will not receive support from the Regents who are a rigidly controlled group of Dukakis loyalists who will only do what they are told by the present administration under Tsongas and Dukakis.
I'll continue to keep you advised.

The Second Letter
The second letter, dated June 19, 1990, was written by NESL's then Director of
Placement and Career Services to White and stated:
It was a pleasure as always to see you at the LSAC conference in Florida. The rainy afternoons seemed to set the tone for the changes announced concerning the LSAT. I just spent the better part of last week listening to the reaction of the Northeast Pre-Law advisors at their conference. To say that they were interested in the changes in the test administration would be putting it mildly.
As we had discussed, Massachusetts School of Law has been certified by the state (see enclosed article). This certification enables their graduates to take the Massachusetts bar examination. The dean and his admissions' director came to the Northeast Pre-Law Advisors conference last week. They requested a table at the Law School Fair (see enclosed catalogue). The Board of the conference had to accommodate them as the bylaws only indicated that an organization had to be a law school to participate. There was no indication on their school sign that they were not an ABA approved school. The next morning at the business meeting the bylaws of the association were amended to include the words "an ABA approved law school."
I hope that you have an enjoyable summer. Please give Kathy my best. I will probably see you in Chicago in August.

The Third Letter
In the third letter exchanged between MSL and ABA dated June 27, 1990, Dean White wrote to Chairman Lawton:
I appreciate your ongoing clipping service about the Commonwealth? Massachusetts School of Law at Lowell. What do you think the possibility would be for the ABA approved Massachusetts law schools to petition the Massachusetts Supreme Judicial Court to amend its rules to require graduation from an ABA approved law school as a requirement for sitting for the Massachusetts bar examination? I would be grateful for your thoughts on the matter. I trust all goes well with you and the School. I look forward to visiting the School and seeing your ongoing progress.

The Fourth Letter
The final letter, dated July 17, 1990, Lawton's response to White, reads:

*893 I am in receipt of your letter of June 27, 1990, and agree wholeheartedly that perhaps representatives of the American Bar Association and Massachusetts Law School should interest themselves by petitioning the Massachusetts Supreme Judicial Court. It is my opinion that the initial voice of leadership should emanate from individuals such as former American Bar Association President, Robert Meserve, and the long-time Dean of Boston College Law School, Professor Richard Huber, and the President Elect of the American Bar Association, Attorney John J. Curtin, Jr. Through the years, I received requests to assist applicants to obtain admission to New England who are unusually well qualified in terms of their undergraduate cume and their Law School Test Score. The applicants are usually graduates of Boston University, Boston College, Northeastern University, Suffolk University, and Harvard. The reason they cannot be accepted into a graduate program in their own law schools is based upon the fact that there is a general effort on the part of the major schools to build their constituency with extraordinarily exceptional candidates from colleges and universities across the country. There is a general perception that there is no particular feeling of obligation to accept well-qualified candidates from their undergraduates schools.
It is because of this admissions philosophy that I personally do not believe that the major law schools in Boston are going to undertake any steps to petition the Massachusetts Supreme Judicial Court to amend its rules because of what I perceive as their lack of concern about the creation of new and unaccredited law schools which may come into existence in this state.
In short, it is my opinion that those individuals who have had close ties with the American Bar Association on the national level should be recruited as a leadership team to inaugurate a campaign to discourage the further expansion of new and unaccredited law schools.
It was nice to hear that you might visit us, and we would really enjoy the opportunity of seeing you and extending the hospitality of the law school and of Boston. With best wishes always, I am
NOTES
[1] MSL originally brought this action in the Massachusetts Superior Court. The ABA, along with the individual defendants, removed this case to federal court claiming that the United States district court had jurisdiction over MSL's claims under 28 U.S.C. § 1331, pursuant to the Higher Education Act, 20 U.S.C. § 1099b. This court denied a motion to remand by MSL.
[2] In the Complaint, MSL only alleges that NESL (along with the other defendants) committed a "tortious misrepresentation." In its opposition memorandum, MSL specifies that the particular "tortious misrepresentations" for which NESL is liable are business defamation and injurious falsehood.
[3] Mass.Gen. Laws c. 93A § 11 provides that:

Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method or competition or an unfair or deceptive act or practice ... may ... bring an action ... for damages.
[4] The Supreme Judicial Court (SJC) has held that an organization's status as a "`charitable' corporation is not, in and of itself, dispositive of the issue whether c. 93A applies." Planned Parenthood v. Problem Pregnancy, Inc., 398 Mass. 480, 493, 498 N.E.2d 1044 (1986). However, although Massachusetts courts read c. 93A broadly, its application is not without limits. One limit appears to be that a nonprofit or charitable organization may be protected from c. 93A liability if, in the transaction in question, the nonprofit is merely engaged in the customary business necessary to meet its charitable purpose. See, e.g., Hubert v. Melrose-Wakefield Hosp. Ass'n, 40 Mass.App.Ct. 172, 661 N.E.2d 1347 (1996) (c. 93A claim did not lie against hospital because "[n]othing in the record indicated that the hospital, a nonprofit organization, was acting in a business context so as to generate a profit" in land purchase from home owners) Id. at 176, 661 N.E.2d 1347. However, if the nonprofit goes beyond its ordinary business and behaves instead in a "business context," it can be found liable under c. 93A. See, e.g., Linkage Corp. v. The Trustees of Boston University, 1995 WL 809556 (Mass.Super.Ct.1995) (finding Boston University actions in running the Boston University Corporate Education Center actionable under c. 93A because Center was distinct entity from BU set up to generate "cash stream" from corporate clients).